******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* WILLIAM CASTILLO
(AC 36435)

Keller, Prescott and Harper, Js.

*Argued March 8—officially released May 24, 2016*

(Appeal from Superior Court, judicial district of
Litchfield, Danaher, J.)

*Richard Emanuel*, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney,
with whom, on the brief, were *David S. Shepack*, state's
attorney, and *Terri L. Sonnemann*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, William Castillo, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (3), and attempt to commit robbery in the second degree in violation of General Statutes §§ 53a-49 and 53a-135 (a) (1) (A). The defendant, who was nearly seventeen years old at the time of his arrest and eventually was tried as an adult, claims on appeal that the trial court improperly denied his motion to suppress statements that he made to the police, including a written confession, because they were obtained in violation of his constitutional and statutory rights. In particular, the defendant contends that (1) the police subjected him to custodial interrogation without the benefit of adequate *Miranda*[1] warnings because the juvenile *Miranda* waiver form administered to him prior to his questioning failed to advise him that any statements that he made could be used against him not only in any juvenile proceeding but in an adult criminal prosecution; (2) any statements that he gave to the police were involuntary and, thus, their admission at trial violated his right to due process; (3) his statements were inadmissible at trial pursuant to General Statutes § 46b-137 (c); and (4) even if the defendant's statements were lawfully obtained, this court should exercise its inherent supervisory authority to adopt a rule setting new standards governing "the admissibility of statements and confessions obtained through the interrogation of juveniles."

We conclude that the trial court properly found that defendant was not "in custody" at the time he gave the statements at issue and, therefore, we need not address whether he was properly informed of his *Miranda* rights or consider the validity of his waiver of those rights. We further conclude that the trial court correctly determined that the defendant's statements were voluntary and not obtained in violation of his right to due process, nor were they admitted at trial in violation of § 46b-137, which is inapplicable in this context. Finally, because we conclude that the statements given by the defendant in the present case were not made during custodial interrogation, we decline to decide whether we should require, pursuant to our supervisory authority, that law enforcement provide juveniles who are subjected to custodial interrogation additional *Miranda* related warnings. In sum, we affirm the judgment of the trial court.

The following facts, which reasonably could have been found by the jury on the basis of the evidence admitted at trial or were found by the court in deciding the motion to suppress, and procedural history are relevant to our review of the defendant's claims.

On March 23, 2012, the defendant was a student at Torrington High School, and was less than one month from his seventeenth birthday. At about 8:30 p.m. on that date, he and several other teenagers left a high school dodgeball game together in a Jeep Grand Cherokee. The defendant and his friends spotted a group of middle school students leaving a minimart on foot, and they decided to "jump" the younger boys and steal their money. The older group of teenagers followed the three middle school students, eventually stopping the Jeep in front of them. After exiting the Jeep, the defendant and his friend assaulted the younger boys in an attempt to rob them. The defendant grabbed one of the boys, Liam, and pushed him into a nearby parked vehicle. He held a screwdriver to Liam's abdomen and demanded his money. When the defendant and his friends discovered that the younger boys had no money, they fled in the Jeep.

Several neighbors witnessed all or part of the incident and gave statements to the police, who had responded to a report of an assault. Those statements included a description of the Jeep that the defendant and his friends were using and a partial license plate number. The police also later interviewed the victims, who, although unable to identify their attackers because they had disguised themselves by partially concealing their faces with their T-shirts, gave partial descriptions.

At about the time of the incident in question, other police officers spotted a Jeep traveling at a high rate of speed in the vicinity. They followed the vehicle into an apartment complex at which time they initiated a stop, eventually identifying the passengers, including the defendant. Although the police were aware of the recent assault, they did not believe that they had enough evidence to arrest or otherwise detain the occupants of the Jeep.

A week or so following the incident, the police received information that led them to believe that the occupants of the Jeep that they had stopped at the apartment complex were the same group that had attempted to rob the middle school boys. Police detectives interviewed each of the occupants that they had previously identified during the traffic stop.

Detective Todd Fador, the lead investigator, first went to the defendant's apartment at 330 Highland Avenue on April 10, 2012, for the purpose of conducting an interview with the defendant; however, he found the defendant alone at that time. Because of the defendant's age, Fador would not conduct an interview without a parent present. Fador subsequently contacted the defendant's mother, Yocasta Monegro, and advised her that the police had stopped by her home.

Fador returned to the defendant's home on April 13, 2012, at approximately 5 p.m. Monegro, Monegro's boy-

friend, two younger children, and the defendant were home at that time. Fador was accompanied by another detective, Keith Dablaine, and Officer Angel Rios. Fador had brought Rios along because Rios was fluent in Spanish, and, at their initial meeting on April 10, 2012, the defendant had told Fador that Monegro did not speak English.[2] Fador and Dablaine carried sidearms and wore plain clothes with badges around their necks. Rios was dressed in a police uniform and also wore a sidearm.

Monegro answered the door, at which point Rios explained to her, in Spanish, that the purpose of their visit was to speak with the defendant, who had been identified as a suspect. The interview of the defendant was conducted in the living room. The room had a sofa, a love seat, and a chair. In addition to the main entrance to the room, it had two other doors. The defendant was not immediately present when the police arrived, but Monegro indicated that she would get him. When the defendant entered the room, Fador advised the defendant and Monegro of their juvenile and parental rights, respectively. Rios translated Fador's advisement into Spanish. The defendant was presented with a juvenile waiver form that advised him of his rights, including his right to remain silent, to consult with an attorney, and to stop answering questions at any time. The defendant initialed six separate paragraphs on the form and signed the form. Monegro was given a parental consent form that contained a similar advisement of rights in English, which Rios translated for her prior to her initialing and signing the form. The defendant was calm throughout this procedure.

As the trial court stated in its memorandum of decision denying the motion to suppress, after the waiver forms were signed, Fador "verbally advised the defendant that he was free to ask the officers to leave, that he was free to stop speaking to the officers, and that he did not have to speak to the officers at all. . . . [T]he defendant did not ask any questions about his rights, he did not appear to be confused, and he said that he understood his rights.

"The defendant agreed to give a statement, asking Fador to write it out. [Fador] did so, stopping every few sentences to give [Rios] an opportunity to translate the defendant's statements to [Monegro]. The defendant was cooperative and did not appear to be worried, although it was apparent that [Monegro] was growing increasingly upset as her son progressed with his statement. . . . After the defendant finished making his statement, he reviewed what [Fador] had written and then signed the statement. . . . The entire visit took between forty-five minutes and one hour. At no time did anyone ask the officers to stop questioning the defendant or to leave the home. . . .

"[N]one of the officers advised the defendant that his

involvement in the robbery could ultimately lead to his deportation. . . . [W]hen [Monegro] asked about the risk of deportation, [Rios] replied that such an action is not within his jurisdiction but is, rather, an issue for the Bureau of Immigration and Customs Enforcement." (Citation omitted.) Although the defendant confessed, first orally and then in writing, to having participated in the events of March 23, 2012, and having attempted to steal money from one of the middle school students, he denied having used any weapon.[3] The defendant was not arrested at that time, and the detectives and Rios left the apartment.

Approximately one month later, on May 10, 2012, the defendant was arrested pursuant to a juvenile arrest warrant, charging him with the following delinquent acts: first degree robbery in violation of § 53a-134; risk of injury to a child in violation of General Statutes § 53-21; attempted larceny in the sixth degree in violation of General Statutes §§ 53a-49 and 53a-125b; conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134; assault in the third degree in violation of General Statutes § 53a-61; and carrying a dangerous weapon in violation of General Statutes § 53-206 (a).

He first appeared in Superior Court for juvenile matters on May 11, 2012. Because he was charged with committing a class B felony (first degree robbery), the case was then automatically transferred to the regular criminal docket pursuant to General Statutes § 46b-127 (a)[4] and then to the part A docket in the Litchfield courthouse. The defendant subsequently entered pro forma pleas of not guilty to a five count information that included all the charges underlying the juvenile arrest warrant except for the charge of carrying a dangerous weapon.

Just prior to jury selection, on August 26, 2013, the state filed a long form information charging the defendant in two counts with first degree robbery and second degree robbery. The defendant entered pleas of not guilty on both counts.

On August 30, 2013, the defendant filed a motion to suppress his April 13, 2012 oral and written statements to the police, arguing that any waiver of his *Miranda* rights was not knowingly, intelligently, or voluntarily given and, even if the police satisfied *Miranda*, his statements were obtained involuntarily in violation of his due process rights under the state and federal constitutions. The state filed an opposition arguing that *Miranda* warnings were not necessary in the present case because the defendant was not "in custody" when the challenged statements were made and there simply was no evidence of any police coercion or other police activity necessary to support the defendant's due process claim. The court, *Danaher, J.*, conducted a hearing on the motion to suppress at which time the court heard

testimony from Fador, Rios, and Monegro. Following the hearing, on September 24, 2013, the court issued a written memorandum of decision agreeing with the arguments of the state and denying the motion to suppress.

Prior to trial, on September 30, 2013, the state filed a substitute long form information, amending the charges against the defendant to one count of attempt to commit first degree robbery in violation of §§ 53a-49 and 53a-134 (a) (3), and one count of attempt to commit second degree robbery in violation of §§ 53a-49 and 53a-135 (a) (1) (A). The defendant pleaded not guilty to those charges, and the case proceeded to trial, following which the jury found the defendant guilty on both counts. The court sentenced the defendant to a total effective term of five years imprisonment, suspended after eighteen months, with five years of probation. This appeal followed.

The sole claim raised on appeal is that the court improperly denied the defendant's motion to suppress his statements to the police. The defendant makes several arguments in support of his claim, each of which we will discuss in turn. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [If] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Citation omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008).

I

We begin with the defendant's argument that he was entitled to suppression of his oral statements and written confession because they were the product of a custodial interrogation conducted without the benefit of proper *Miranda* warnings. According to the defendant, although he signed a form purporting to waive his *Miranda* rights prior to the police questioning him, that particular waiver form was intended for use in juvenile matters and was ineffective as a waiver of the defendant's rights in this case because it did not inform him that statements he made could be used against him not only in any subsequent juvenile proceeding but also in proceedings to convict him as an adult offender. Because we conclude that the defendant was not "in custody" when he gave his statements, and, therefore, not subjected to custodial interrogation by the police, *Miranda* warnings were not constitutionally required at that time, nor was it necessary for the police to obtain a valid waiver prior to questioning the defendant.

Accordingly, we reject this aspect of the defendant's claim.

Our Supreme Court has set forth the following principles regarding the requirement of *Miranda* warnings, which help guide our analysis of the defendant's argument. "Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it . . . only an interrogation that occurs when a suspect is *in custody* heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. . . . This is so because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . . Thus, the court in *Miranda* was concerned with protecting defendants against interrogations that take place in a police-dominated atmosphere, containing inherently compelling pressures [that] work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely . . . . By adequately and effectively appris[ing] [a suspect] of his rights and reassuring the suspect that the exercise of those rights must be fully honored, the *Miranda* warnings combat [the] pressures inherent in custodial interrogations. . . . In so doing, they enhance the trustworthiness of any statements that may be elicited during an interrogation. . . . Consequently, police officers are not required to administer *Miranda* warnings to everyone whom they question . . . rather, *they must provide such warnings only to persons who are subject to custodial interrogation.* . . . To establish entitlement to *Miranda* warnings, therefore, the defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, 311 Conn. 182, 191–92, 85 A.3d 627 (2014). In the present case, there is no dispute that the statements that the defendant sought to suppress were given in response to his questioning by the police. What is disputed is whether the defendant was "in custody" for purposes of *Miranda* when that questioning occurred.

"As used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. . . . In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable person test . . . the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave. . . . Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount

to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry . . . and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. . . .

"Of course, the clearest example of custody for purposes of *Miranda* occurs when a suspect has been formally arrested. As *Miranda* makes clear, however, custodial interrogation includes questioning initiated by law enforcement officers after a suspect has been arrested or otherwise deprived of his freedom of action *in any significant way*. . . . Thus, not all restrictions on a suspect's freedom of action rise to the level of custody for *Miranda* purposes . . . . [T]he ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his or her] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address." (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) Id., 193–95.

Among the factors that a court may consider in determining whether a suspect was "in custody" for purposes of *Miranda*, are the following: "(1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." Id., 197.

In reviewing a trial court's determination of whether a person was "in custody" for *Miranda* purposes, we employ the following standard of review. "The trial court's determination of the historical circumstances surrounding the defendant's interrogation [entails] findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the

degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo. . . . In other words, we are bound to accept the factual findings of the trial court unless they are clearly erroneous, but we exercise plenary review over the ultimate issue of custody." (Citation omitted; internal quotation marks omitted.) Id. "The defendant bears the burden of proving custodial interrogation." *State* v. *Pinder*, 250 Conn. 385, 409, 736 A.2d 857 (1999).

Having scrupulously examined the record, we conclude, in agreement with the trial court and the state, that no reasonable person in the defendant's position would have believed that he was "in custody" for purposes of *Miranda*. The circumstances surrounding the defendant's interview simply do not support a claim that he was in custody prior to the time that he signed the juvenile waiver form and gave his statement and written confession. Significantly, the defendant was not questioned at a police station or other unfamiliar and inherently coercive location, but in the relative comfort and familiarity of his own home, with family present. As recognized by our Supreme Court, "an encounter with police is generally less likely to be custodial when it occurs in a suspect's home." *State* v. *Mangual*, supra, 311 Conn. 206, citing, e.g., *Miranda* v. *Arizona*, 384 U.S. 436, 449–50, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[the suspect] is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home" [internal quotation marks omitted]). We are, of course, also aware that *Mangual* instructs that, given the right set of circumstances, a person's home may be transformed into the type of police dominated atmosphere that could undermine an individual's decision to remain silent. *State* v. *Mangual*, supra, 199–202, 206–207. Such circumstances, however, simply were not present here. The defendant's efforts to equate this case with the type of environment that existed in the *Mangual* case are unpersuasive.

In *Mangual*, the defendant was questioned in her apartment during the execution of a search warrant. Id., 186–87. The Supreme Court concluded that the defendant was "in custody" when the police elicited statements from her during that search because the totality of the circumstances surrounding the execution of the warrant by the police had transformed the defendant's home into the type of police dominated atmosphere that necessitated that the police advise the defendant of her *Miranda* rights prior to questioning her. Id., 190–212. In particular, the court noted the following factors as being key to its determination that the defendant was "in custody."

First, the police had initiated the contact, and were not invited into the apartment by the defendant, but

"entered under the authority of a search warrant, an inherently coercive and intimidating police action." Id., 199. The court considered the action particularly intimidating given that seven armed officers in tactical vests participated in the execution of the warrant. Id., 186, 199, 201. Second, the officers brandished their weapons when they announced themselves and entered the small, four room apartment, actions that the court deemed an occupant reasonably could have associated with the police effecting an arrest. Id., 199–201. The court found significant that the "officers prohibited the defendant from leaving or otherwise moving about the apartment. In such circumstances, it was reasonable for the defendant to perceive such an imposing display of authority as a clear indication that the police intended to assume and maintain full control over her and her daughters." Id., 200. The court considered the relatively large number of officers, "many, if not all" of whom were present in the living room when the defendant was questioned, to be a third factor supporting a finding of custody, citing several federal Circuit Courts of Appeal for the proposition that "the presence of a large number of visibly armed law enforcement officers goes a long way [toward] making the suspect's home a police-dominated atmosphere." (Internal quotation marks omitted.) Id., 201. Fourth, the police exercised "complete control over the defendant and her surroundings before, during and after" her questioning. Id. As soon as the officers entered the apartment, they ordered the defendant to go to the living room, where she was confined to the couch and placed under guard. The court noted that "[t]his exercise of total control over the defendant stands in stark contrast to the far more relaxed environment that is a hallmark of interrogations in a suspect's home that have been found to be noncustodial." Id., 201–202. Finally, the court indicated that the police never explained to the defendant "the nature, purpose, or likely duration of her detention." Id., 202.

Turning to the present case, our consideration of the circumstances surrounding the defendant's questioning leaves us unconvinced of the existence of a police dominated atmosphere akin to that present in *Mangual*. Although the police initiated contact with the defendant and his family, the police did not enter the house on their own authority, such as pursuant to a search warrant, but were invited in by Monegro. The police informed Monegro of the purpose for their visit before she allowed them to enter. There were only three officers present, one of whom was acting as a translator. The detectives wore plain clothes, not tactical gear. Although the defendant was asked to come into the living room to speak with the police, he was never threatened with arrest or searched, he was never handcuffed, and the police took no other action, either verbal or physical, to intimidate the defendant or to restrict his movement or confine him to that particular room.

The detectives and Rios each carried sidearms, but they were never brandished at any point, nor did any of the officers threaten the use of force on the defendant or his family. Both Fador and Rios informed Monegro that she could end the interview at any time, and the defendant was told more than once that his presence was voluntary, and that he was free to leave and did not have to answer their questions. He was told this orally before any questions were ever asked, and the same instructions were provided to him in writing as part of the waiver form, which he signed prior to giving his oral statement and written confession. Such instructions were not provided to the defendant in *Mangual*. Id., 204–205; see *State* v. *Edwards*, 299 Conn. 419, 437, 11 A.3d 116 (2011), and cases cited therein ("a fact finder reasonably might find that a reasonable person would feel free to leave when that person was told repeatedly that he could do so" [internal quotation marks omitted]). There is no evidence in the record that the defendant was overly nervous or intimidated during the encounter.

In terms of whether a reasonable person would feel that his freedom of movement was restrained to the degree associated with a formal arrest and, therefore, that he was "in custody," the circumstances surrounding the defendant's interview in the present case appear no more coercive or intimidating an atmosphere than was present in other cases in which our Supreme Court determined that a suspect questioned in a residence prior to an arrest was not "in custody" and, thus, not entitled to *Miranda* rights. See, e,g., *State* v. *Kirby*, 280 Conn. 361, 369–70, 392–94, 396, 908 A.2d 506 (2006) (defendant not "in custody" for *Miranda* purposes although five police officers arrived at his home at 4:30 a.m. to question him about kidnapping and assault because defendant invited officers into home, defendant knew why police were there, encounter lasted less than fifteen minutes, officer's guns stayed holstered, and defendant not handcuffed until after he admitted to kidnapping); *State* v. *Johnson*, 241 Conn. 702, 714–22, 699 A.2d 57 (1997) (defendant not "in custody" although confronted by two detectives and uniformed police officer in driveway of father's house prior to consenting to be questioned in kitchen).[5]

The defendant contends that the court based its conclusion that he was not in custody in part on an erroneous factual finding, namely, that he was present at the home when the police first arrived. According to the defendant, the evidence shows that he was not at home and that he had to be summoned to return, either by Monegro or her boyfriend. The defendant argues that whether he was at home when the police arrived is significant to our consideration of whether he was "in custody" because his absence "demonstrates that the defendant was in a position to be questioned by the police *only* because they *first* exercised their authority

to *compel* his presence." (Emphasis in original.) The defendant asserts that, absent probable cause to arrest him, the police lacked authority to compel his presence for questioning, and that they used Monegro to accomplish what they could not do themselves.

Even if we were to agree, however, with the defendant's contention that a juvenile summoned by a parent or guardian to return home to speak with the police would, in some manner, feel more coerced to cooperate and, thus, less free to leave and stop the interview than a juvenile already present at home when police arrived, we do not determine that the court's finding that the defendant was at home when the police arrived is clearly erroneous on the basis of the record before us. It is the function of the trial court to weigh the evidence before it and to determine the credibility of witnesses. *State* v. *Lawrence*, 282 Conn. 141, 154–55, 920 A.2d 236 (2007). At the suppression hearing, Monegro testified that the defendant was at home with the rest of the family when the police arrived. The court was free to credit that testimony, which was never directly contradicted. At best, the record is unclear whether the defendant, who undisputedly was not present in the room when Monegro answered the front door, initially was in another part of the home or elsewhere when the police arrived. The defendant notes that Fador testified at the suppression hearing that when the police told Monegro that they needed the defendant present, she stated that she would "get him there," and that the defendant arrived shortly thereafter. He further notes Rios' testimony that he thought Monegro's boyfriend made a phone call to reach the defendant, who "responded back to the house." Neither statement, however, directly contradicts or is necessarily inconsistent with Monegro's testimony or the court's factual finding that the defendant was home, as neither is determinative of where the defendant was before he was asked, either verbally or by phone, to come to the living room to speak to the police. Because the court's factual finding is supported by evidence in the record, it was not clearly erroneous.

We conclude that the defendant was not "in custody" at the time he provided his statements to the police and, therefore, was not entitled to *Miranda* warnings. Having so concluded, we do not address the remaining aspects of the defendant's argument, including whether the use by the police of the juvenile *Miranda* waiver form in a case eventually tried in adult court properly effectuated a valid waiver of the defendant's *Miranda* rights or whether some additional warning was constitutionally required.

## II

We turn next to the defendant's argument that, regardless of whether he was in custody, the court should have granted his motion to suppress because his

statements and confession were obtained in violation of his rights to due process under the state and federal constitutions because they were involuntarily made. We are not persuaded because there is no evidence in the record that the defendant's statements were obtained as a result of any coercive behavior or wrongful action by the police affecting the voluntariness of the defendant's statements.

The principles governing our review of a trial court's ruling on the voluntariness of a defendant's oral or written statements are well established. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . . The ultimate test remains . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the [age] of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 153.

"[W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record." *State* v. *Pinder*, supra, 250 Conn. 420. As our Supreme Court clarified in *Pinder*, "applying the proper scope of review to the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness." Id., 421.

Here, the defendant's argument that his statements to the police were involuntary and, thus, violative of due process finds no support in the record. The defendant was nearly seventeen years old at the time he was questioned, and there is no indication that he was poorly educated or developmentally challenged. The defendant was informed of his constitutional rights. The

defendant was not alone when questioned; his mother was present. The defendant was not subjected to a prolonged and repeated interrogation; the whole process lasted no more than one hour.

Ordinarily, a court will deem a statement or confession involuntary only if there is some coercive police conduct that is causally related to it. See *State* v. *Reynolds*, 264 Conn. 1, 54, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). As we indicated in rejecting the defendant's *Miranda* claim, the atmosphere in which the police questioned the defendant was not in and of itself overly coercive in nature. Furthermore, the defendant has not directed our attention to any evidence in the record of deceptive or intimidating police behavior different from that underlying his argument that the police engaged in custodial interrogation, nor has our review disclosed any. In rejecting the defendant's argument that he was "in custody" when he gave his statements, we necessarily determined that the circumstances of his questioning by police reasonably could not be viewed as presenting any serious danger of having overborne the defendant's will to resist, thereby resulting in an involuntary statement. On the basis of our scrupulous review of the record, we conclude that the defendant's rights to due process under the state and federal constitutions were not violated.

III

The defendant next argues that the court should have granted his motion to suppress because, even if his statements were not the fruit of a custodial interrogation, they nevertheless were inadmissible in accordance with the criteria set forth in § 46b-137 (c). The state responds that the argument is meritless because, by its plain language, § 46b-137 is applicable only to juvenile court proceedings, not to proceedings in adult court. We agree with the state that § 46b-137 is inapplicable in the present case, and, thus, the defendant's argument fails on its merits.[6]

"Issues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, *including the question of whether the language does so apply*." (Emphasis added; internal quotation marks omitted.) *State* v. *Fernando A.*, 294 Conn. 1, 13, 981 A.2d 427 (2009). Here, § 46b-137 contains clear language limiting its applicability to proceedings in juvenile court.

Section 46b-137, which is tellingly titled, "Admissibility of admission, confession or statement *in juvenile proceedings*,"[7] provides in relevant part: "(b) Any admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to

a police officer or Juvenile Court official, except an admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer in connection with a case transferred to the Juvenile Court from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters, shall be inadmissible *in any proceeding concerning the alleged delinquency of the child* making such admission, confession or statement, unless (1) the police or Juvenile Court official has made reasonable efforts to contact a parent or guardian of the child, and (2) such child has been advised that (A) the child has the right to contact a parent or guardian and to have a parent or guardian present during any interview, (B) the child has the right to retain counsel or, if unable to afford counsel, to have counsel appointed on behalf of the child, (C) the child has the right to refuse to make any statement, and (D) any statement the child makes may be introduced into evidence against the child.

"(c) The admissibility of any admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer or Juvenile Court official, except an admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer in connection with a case transferred to the Juvenile Court from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters, shall be determined by considering the totality of the circumstances at the time of the making of such admission, confession or statement. When determining the admissibility of such admission, confession or statement, the court shall consider (1) the age, experience, education, background and intelligence of the child, (2) the capacity of the child to understand the advice concerning rights and warnings required under subdivision (2) of subsection (b) of this section, the nature of the privilege against self-incrimination under the United States and Connecticut Constitutions, and the consequences of waiving such rights and privilege, (3) the opportunity the child had to speak with a parent, guardian or some other suitable individual prior to or while making such admission, confession or statement, and (4) the circumstances surrounding the making of the admission, confession or statement, including, but not limited to, (A) when and where the admission, confession or statement was made, (B) the reasonableness of proceeding, or the need to proceed, without a parent or guardian present, and (C) the reasonableness of efforts by the police or Juvenile Court official to attempt to contact a parent or guardian." (Emphasis added.)

The defendant argues in his brief that subsection (c) of § 46b-137 has never been judicially construed and

that it appears to enlarge the *Miranda* type protections afforded to sixteen and seventeen year old offenders, as set forth in subsection (b), by "directing trial courts to consider a child's capacity to understand [such] warnings . . . *without any requirement* that the child was 'in custody' when the statement was made." (Emphasis in original.) The defendant, however, fails to address adequately the applicability of the statute, and ignores its plain language. The subject matter of both subsections (b) and (c) of § 46b-137 is the admissibility of statements made by sixteen and seventeen year olds, and, thus, the two subsections must be construed together. By its very terms, subsection (b) makes clear that these provisions only apply to "proceedings . . . concerning the alleged delinquency of the child . . . ." General Statutes § 46b-137 (b). The language in subsection (c) that exempts from operation any cases originating from the youthful offender docket or regular criminal court reinforces the notion that the statute only applies in juvenile proceedings. Here, the operative charges against the defendant did not include allegations of delinquency. Rather, the defendant was tried for attempted robbery in an adult court.

Our conclusion that subsections (b) and (c) of § 46b-137 are inapplicable in the present case is wholly consistent with, and, thus, is supported by, our Supreme Court's holding and analysis in *State* v. *Ledbetter*, 263 Conn. 1, 818 A.2d 1 (2003). In *Ledbetter*, the court held that subsection (a) of § 46b-137, which refers to statements made by children under sixteen years old, and makes a child's confession inadmissible in a delinquency proceeding unless it was made in the presence of the child's parent or a guardian, does not apply if the state seeks to use that confession in an adult criminal proceeding rather than in juvenile court. Id., 12–18; see also *In re Samantha C.*, 268 Conn. 614, 644, 847 A.2d 883 (2004) ("[s]ection 46b-137 . . . by its language and purpose was enacted to afford certain constitutional rights to parents and children *in juvenile matters*" [citations omitted; emphasis added]).

Despite the defendant's arguments to the contrary, § 46b-137 has no bearing on the admissibility of statements offered in adult proceedings. Accordingly, it could not have provided an independent basis for granting the defendant's motion to suppress. The defendant's argument is, accordingly, without merit.

IV

Finally, the defendant argues, as alternative relief, that we should exercise our inherent supervisory authority over the administration of justice to adopt a new rule governing the admissibility of statements obtained during the interrogation of juveniles. Specifically, the defendant advocates for a per se rule requiring that whenever police investigating a felony give *Miranda* warnings to a juvenile, those warnings must

include notice that any statement by the juvenile may be used against the juvenile in adult criminal court if the case is transferred there from juvenile court. We decline the defendant's request to exercise our supervisory authority.

Our Supreme Court has set forth the scope of the supervisory powers held by the appellate courts of this state as follows: "It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Indeed, there is no principle that would bar us from exercising our supervisory authority to craft a remedy that might extend beyond the constitutional minimum because articulating a rule of policy and reversing a conviction under our supervisory powers is perfectly in line with the general principle that this court ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it] think[s] is preferable as a matter of policy." (Citations omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 764–65, 91 A.3d 862 (2014).

We are not convinced that it is necessary to the due administration of justice to invoke our supervisory authority in the present case. Although we are aware that there is "no ironclad requirement that we refrain from granting a defendant relief pursuant to our supervisory authority unless we first reject any relevant constitutional claim"; *State* v. *Rose*, 305 Conn. 594, 607, 46 A.3d 146 (2012); we nevertheless are mindful that we have determined in the present case that the defendant's *Miranda* rights were never implicated in the present case, and, thus, we believe it is appropriate to leave any discussion of the scope of such warnings for another time. To conclude otherwise seemingly would be incongruent with our jurisprudence requiring us to refrain from deciding issues absent an actual controversy or from giving advisory opinions. See *State* v. *Preston*, 286 Conn. 367, 374, 944 A.2d 276 (2008). Our supervisory authority is meant to be utilized sparingly and only in extraordinary circumstances, which simply are not present here.

Because we have determined in the present case that *Miranda* warnings were not required because the defendant was not subjected to a custodial interrogation, any further discussion about the content of such warnings would be untethered to any actual controversy and, thus, premature. Further, even if we were inclined to consider the defendant's proposed new rule, the defendant has failed to adequately brief why we should adopt such a rule or why it should be applied retroactively in the present case to reverse the defendant's conviction. After noting that such rules normally operate prospectively, the defendant merely urges us to eschew that principle without proper analysis. In order to justify the use of such an extraordinary remedy, it is incumbent that a party provides adequate analysis. See *State* v. *James*, 237 Conn. 390, 434–35 n.36, 678 A.2d 1338 (1996). In sum, we decline the defendant's request to adopt a per se rule regarding the administration of *Miranda* rights to juveniles.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The defendant speaks and understands English. Rios knew the defendant from a previous investigation, in which he had spoken with the defendant in English.

[3] That fall, when Liam began to attend Torrington High School, he heard from other students that the defendant had been one of the older students who had tried to rob him. Liam later approached the defendant in the cafeteria. The defendant confessed to Liam that he had tried to steal money from him, although he again denied having any weapon.

[4] General Statutes (Supp. 2016) § 46b-127 (a) provides: "(1) The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of a capital felony under the provisions of section 53a-54b in effect prior to April 25, 2012, a class A felony, or a class B felony, except as provided in subdivision (3) of this subsection, or a violation of section 53a-54d, provided such offense was committed after such child attained the age of fifteen years and counsel has been appointed for such child if such child is indigent. Such counsel may appear with the child but shall not be permitted to make any argument or file any motion in opposition to the transfer. The child shall be arraigned in the regular criminal docket of the Superior Court at the next court date following such transfer, provided any proceedings held prior to the finalization of such transfer shall be private and shall be conducted in such parts of the courthouse or the building in which the court is located that are separate and apart from the other parts of the court which are then being used for proceedings pertaining to adults charged with crimes."

Subdivision (3) of subsection (a) sets forth a different transfer process in cases in which a child has been charged with violating certain enumerated felonies that are not relevant here. Although there have been several revisions to § 46b-127 (a) since the time of the commission of the crimes at issue here, those changes are not relevant to this appeal. For convenience, we refer to the current revision of the statute.

[5] The situation faced by the defendant also appears no more custodial in nature than any number of cases in which a suspect who is not interviewed at home but transported for questioning to a police station was determined not to be "in custody" and, thus, not entitled to *Miranda* warnings because there was an insufficient indicia of an overly coercive atmosphere present. See, e.g., *State* v. *Edwards*, supra, 299 Conn. 434–35 (defendant with mental limitations not in custody although taken from hospital by police to police station for questioning about suspicious death); *State* v. *Britton*, 283 Conn. 598, 612, 929 A.2d 312 (2007) (defendant not in custody although asked to accompany detectives to police station for questioning); *State* v. *Pinder*,

supra, 250 Conn. 397–98 (defendant not in custody during voluntary polygraph test).

[6] In addition to challenging the merits of the defendant's argument, the state contends that the defendant never raised the argument to the trial court, and, therefore, it is unpreserved for appellate review. The state further contends that the defendant is not entitled to review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),or to plain error review. Because it is apparent that the defendant cannot prevail on his claim of error as a matter of law, we assume without deciding that the argument is properly before us. See *State* v. *Gaines*, 257 Conn. 695, 713 n.13, 778 A.2d 919 (2001) (reviewing potentially unpreserved claim without deciding whether claim preserved because party clearly could not prevail); *State* v. *Haase*, 243 Conn. 324, 338 n.12, 702 A.2d 1187 (1997), cert. denied, 523 U.S. 1111, 118 S. Ct. 1685, 140 L. Ed. 2d 822 (1998) (same).

[7] "Although the title of a statute is not determinative of its meaning, we often have looked to a statute's title as some evidence of that meaning." *Burke* v. *Fleet National Bank*, 252 Conn. 1, 13, 742 A.2d 293 (1999).