KAHN, J.
**313 In this certified appeal, the defendant, William Castillo, appeals from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (3), and attempt to commit robbery in the second degree in violation of General Statutes §§ 53a-49 and 53a-135 (a) (1) (A).[1] The defendant **314 claims that the Appellate Court improperly (1) concluded that, during his in-home interrogation by the police, he was not in custody for purposes of Miranda v. Arizona , 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and (2) declined to exercise its supervisory authority "to adopt a new rule governing the admissibility of statements obtained during the interrogation of juveniles." State v. Castillo , 165 Conn. App. 703, 729, 140 A.3d 301 (2016).[2] Because we conclude **315 that *678 the Appellate Court properly determined that the defendant was not in custody, we affirm the judgment of the Appellate Court. Interpreting the third certified question as a request by the defendant to exercise our supervisory authority to adopt his requested rule, we decline to do so.
The Appellate Court set forth the following relevant facts and procedural history. "On March 23, 2012, the defendant was a student at Torrington High School, and was less than one month from his seventeenth birthday. At about 8:30 p.m. on that date, he and several other teenagers left a high school dodgeball game together in a Jeep Grand Cherokee. The defendant and his friends spotted a group of middle school students leaving a minimart on foot, and they decided to 'jump' the younger boys and steal their money. The older group of teenagers followed the three middle school students, eventually stopping the Jeep in front of them. After exiting the Jeep, the defendant and his friend assaulted the younger boys in an attempt to rob them. The defendant grabbed one of the boys, Liam, and pushed him into a nearby parked vehicle. He held a screwdriver to Liam's abdomen and demanded his money. [When Liam said that he did not have any *679 money on him, the defendant kicked his legs out from under him, causing him to fall to the ground.] When the defendant and his friends **316 discovered that the younger boys had no money, they fled in the Jeep.
"Several neighbors witnessed all or part of the incident and gave statements to the police, who had responded to a report of an assault. Those statements included a description of the Jeep that the defendant and his friends were using and a partial license plate number. The police also later interviewed the victims, who, although unable to identify their attackers because they had disguised themselves by partially concealing their faces with their T-shirts, gave partial descriptions.
"At about the time of the incident in question, other police officers spotted a Jeep traveling at a high rate of speed in the vicinity. They followed the vehicle into an apartment complex at which time they initiated a stop, eventually identifying the passengers, including the defendant. Although the police were aware of the recent assault, they did not believe that they had enough evidence to arrest or otherwise detain the occupants of the Jeep.
"A week or so following the incident, the police received information that led them to believe that the occupants of the Jeep that they had stopped at the apartment complex were the same group that had attempted to rob the middle school boys. Police detectives interviewed each of the occupants [whom] they had previously identified during the traffic stop.
"Detective Todd Fador, the lead investigator, first went to the defendant's apartment at 330 Highland Avenue on April 10, 2012, for the purpose of conducting an interview with the defendant; however, he found the defendant alone at that time. Because of the defendant's age, Fador would not conduct an interview without a parent present. Fador told the defendant that he would return another time and left a business card, which the defendant gave to his mother, Yocasta Monegro, **317 thereby alerting her that the police had stopped by her home.
"Fador returned to the defendant's home on April 13, 2012, at approximately 5 p.m. Monegro, Monegro's boyfriend, two younger children, and the defendant were home at that time. Fador was accompanied by another detective, Keith Dablaine, and Officer Angel Rios. Fador had brought Rios along because Rios was fluent in Spanish, and, at their initial meeting on April 10, 2012, the defendant had told Fador that Monegro did not speak English.[3] Fador and Dablaine carried sidearms and wore plain clothes with badges around their necks. Rios was dressed in a police uniform and also wore a sidearm.
"Monegro answered the door, at which point Rios explained to her, in Spanish, that the purpose of their visit was to speak with the defendant, who had been identified as a suspect. The interview of the defendant was conducted in the living room. The room had a sofa, a love seat, and a chair. In addition to the main entrance to the room, it had two other doors. The defendant was not immediately present when the police arrived, but Monegro indicated that she would get him. When the defendant entered the room, Fador advised the defendant and Monegro of their juvenile and parental rights, respectively. Rios translated Fador's advisement into Spanish. The defendant was presented with a juvenile waiver form that advised *680 him of his rights, including his right to remain silent, to consult with an attorney, and to stop answering questions at any time. The defendant initialed six separate paragraphs on the form and signed the form. Monegro was given a parental consent form that contained a similar advisement of rights in **318 English, which Rios translated for her prior to her initialing and signing the form. The defendant was calm throughout this procedure.
"As the trial court stated in its memorandum of decision denying the motion to suppress, after the waiver forms were signed, Fador 'verbally advised the defendant that he was free to ask the officers to leave, that he was free to stop speaking to the officers, and that he did not have to speak to the officers at all.[4] ... [T]he defendant did not ask any questions about his rights, he did not appear to be confused, and he said that he understood his rights.'
" 'The defendant agreed to give a statement, asking Fador to write it out. [Fador] did so, stopping every few sentences to give [Rios] an opportunity to translate the defendant's statements to [Monegro]. The defendant was cooperative and did not appear to be worried, although it was apparent that [Monegro] was growing increasingly upset as her son progressed with his statement.... After the defendant finished making his statement, he reviewed what [Fador] had written and then signed the statement.... The entire visit took between forty-five minutes and one hour. At no time did anyone ask the officers to stop questioning the defendant or to leave the home....'
**319 " '[N]one of the officers advised the defendant that his involvement in the robbery could ultimately lead to his deportation.... [W]hen [Monegro] asked about the risk of deportation, [Rios] replied that such an action is not within his jurisdiction but is, rather, an issue for the Bureau of Immigration and Customs Enforcement.' ... Although the defendant confessed, first orally and then in writing, to having participated in the events of March 23, 2012, and having attempted to steal money from one of the middle school students, he denied having used any weapon. The defendant was not arrested at that time, and the detectives and Rios left the apartment." (Footnotes added and omitted.) State v. Castillo , supra, 165 Conn. App. at 706-10, 140 A.3d 301.
Approximately one month later, on May 10, 2012, the defendant was arrested pursuant to a juvenile arrest warrant and charged with various delinquent acts, including robbery in the first degree in violation of § 53a-134. Because he was charged with committing a class B felony, robbery in the first degree, the case was then automatically transferred to the regular criminal docket pursuant to General Statutes (Rev. to 2011) § 46b-127 (a) and then to the part A docket in the Litchfield judicial district. The defendant subsequently entered pro forma pleas of not guilty to certain of the charges underlying *681 the juvenile arrest warrant. Prior to jury selection, the state filed a long form information charging the defendant in two counts with robbery in the first degree and robbery in the second degree. The defendant entered pleas of not guilty on both counts.
"On August 30, 2013, the defendant filed a motion to suppress his April 13, 2012 oral and written statements to the police, arguing that any waiver of his Miranda rights was not knowingly, intelligently, or voluntarily given, and, even if the police satisfied Miranda , his statements were obtained involuntarily in violation of his due process rights under the state and federal constitutions.
**320 The state filed an opposition arguing that Miranda warnings were not necessary in the present case because the defendant was not 'in custody' when the challenged statements were made and there simply was no evidence of any police coercion or other police activity necessary to support the defendant's due process claim. The court, Danaher, J. , conducted a hearing on the motion to suppress, at which time the court heard testimony from Fador, Rios, and Monegro. Following the hearing, on September 24, 2013, the court issued a written memorandum of decision agreeing with the arguments of the state and denying the motion to suppress.
"Prior to trial, on September 30, 2013, the state filed a substitute long form information, amending the charges against the defendant to one count of attempt to commit first degree robbery in violation of §§ 53a-49 and 53a-134 (a) (3), and one count of attempt to commit second degree robbery in violation of §§ 53a-49 and 53a-135 (a) (1) (A). The defendant pleaded not guilty to those charges, and the case proceeded to trial, following which the jury found the defendant guilty of both counts. The court sentenced the defendant to a total effective term of five years imprisonment, suspended after eighteen months, with five years of probation." Id., at 711-12, 140 A.3d 301.
The defendant appealed to the Appellate Court, claiming, inter alia, that the trial court improperly denied his motion to suppress because his statements were obtained in violation of his constitutional rights. Specifically, the defendant claimed that (1) the police subjected him to a custodial interrogation without providing him with adequate Miranda warnings, (2) the trial court's finding that he was home when the officers arrived was clearly erroneous, and (3) the Appellate Court should exercise its supervisory authority to issue a prophylactic rule requiring that juvenile waiver forms **321 inform a juvenile that his statements may be used against him not only in juvenile proceedings, but also in adult criminal proceedings, should his case be transferred.[5] Id., at 705-706, 140 A.3d 301. The Appellate Court concluded that the trial court properly determined that the defendant was not in custody when he gave the statements and that the finding that the defendant was home when the police arrived to question him was not clearly erroneous. See id., at 721-22, 140 A.3d 301. The court declined to exercise its *682 supervisory authority to issue a prophylactic rule requiring the waiver forms to warn that any statements could be used against a juvenile in adult criminal proceedings, following a transfer. Id., at 729, 140 A.3d 301. This certified appeal followed. See footnote 2 of this opinion.
The standard of review for a motion to suppress is well established. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record.... [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence.... [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are **322 legally and logically correct and whether they find support in the facts set out in the memorandum of decision....
"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness.... It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony.... Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses.... We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) State v. Kendrick , 314 Conn. 212, 223, 100 A.3d 821 (2014).
I
We first address the defendant's claim that the Appellate Court improperly concluded that he was not in custody for purposes of Miranda . As a threshold matter, we observe that the trial court's findings as to " 'the historical circumstances surrounding [a] defendant's interrogation [entails] questions of fact....' " State v. Pinder , 250 Conn. 385, 410, 736 A.2d 857 (1999). Accordingly, and in light of the constitutional implications of the issue and upon our scrupulous examination of the record, those findings will not be disturbed unless they are clearly erroneous. State v. Kendrick , supra, 314 Conn. at 222-23, 100 A.3d 821. "The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest ... calls for application of the **323 controlling legal standard to the historical facts [and] ... therefore, presents a ... question of law ... over which our review is de novo." (Internal quotation marks omitted.) State v. Mangual , 311 Conn. 182, 197, 85 A.3d 627 (2014).
"[P]olice officers are not required to administer Miranda warnings to everyone whom they question ... rather, they must provide such warnings only to persons who are subject to custodial interrogation." (Citation omitted; internal quotation marks omitted.) Id., at 192, 85 A.3d 627. In the present case, it is undisputed that the police were interrogating the defendant. Accordingly, the only question is *683 whether he was in custody. On that issue, the defendant bears the burden of proof. See State v. Pittman , 209 Conn. 596, 606, 553 A.2d 155 (1989) (defendant bears burden to prove custodial interrogation).
"As used in ... Miranda [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.... In determining whether a person is in custody in this sense ... the United States Supreme Court has adopted an objective, reasonable person test ... the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation ... a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave.... Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of Miranda . [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry ... and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station **324 house questioning at issue in Miranda .... Of course, the clearest example of custody for purposes of Miranda occurs when a suspect has been formally arrested. As Miranda makes clear, however, custodial interrogation includes questioning initiated by law enforcement officers after a suspect has been arrested or otherwise deprived of his freedom of action in any significant way.... Miranda v. Arizona , supra, 384 U.S. at 444, 86 S.Ct. 1602. Thus, not all restrictions on a suspect's freedom of action rise to the level of custody for Miranda purposes; in other words, the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody.... Rather, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest.... Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that Miranda sought to address.
"With respect to the issue of whether a person in the suspect's position reasonably would have believed that [he] was in police custody to the degree associated with a formal arrest, no definitive list of factors governs [that] determination, which must be based on the circumstances of each case.... Because, however, the [court in] Miranda ... expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent] ... circumstances relating to those kinds of concerns are highly relevant on the custody issue.... In other words, in order to determine how a suspect [reasonably] would have gauge[d] his freedom of movement, courts must examine all of the circumstances **325 surrounding the interrogation.... Although this court has not been called on to decide whether the totality of the circumstances surrounding the execution of a search warrant at a suspect's home rendered the atmosphere police-dominated for purposes of Miranda , the Appellate Court has addressed that issue ... and we previously have considered whether a suspect was in custody when he invited the police into his home and willingly agreed to speak to them.... A review of *684 these and related cases from this state, as well as federal and sister state cases involving the interrogation of a suspect during a police search of his residence, reveals the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of Miranda : (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) State v. Mangual , supra, 311 Conn. at 193-97, 85 A.3d 627. Because the defendant in the present case is a juvenile, his age is a factor that courts must consider in determining whether he reasonably would have believed that he was in custody at the time of the interrogation. J.D.B. v. North Carolina , 564 U.S. 261, 264, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011).
Our scrupulous review of the record leads us to agree with the Appellate Court that "no reasonable person in **326 the defendant's position would have believed that he was 'in custody' for purposes of Miranda ." State v. Castillo , supra, 165 Conn. App. at 716, 140 A.3d 301. As the Appellate Court observed, it is significant that "the defendant was not questioned at a police station or other unfamiliar and inherently coercive location, but in the relative comfort and familiarity of his own home,[6] with family present." (Footnote added.) Id., at 716-17, 140 A.3d 301. Although the court correctly recognized that, under some circumstances, the mere fact that an interrogation takes place in a person's home will not prevent that interrogation from being custodial, it relied on our decision in Mangual for the proposition that " 'an encounter with police is generally less likely to be custodial when it occurs in a suspect's home.' " Id., at 717, 140 A.3d 301, quoting State v. Mangual , supra, 311 Conn. at 206, 85 A.3d 627. The facts of the present case, however, are distinguishable from those presented in Mangual , in which we concluded that the defendant was in custody when police interrogated her in her home while executing a search warrant. See State v. Mangual , supra, at 212, 85 A.3d 627. The Appellate Court explained that, in Mangual , "the totality of the circumstances surrounding the execution of the warrant by the police had transformed the defendant's home into the type of police dominated atmosphere that necessitated that the police advise the defendant of her Miranda rights prior to questioning her." State v. Castillo , supra, at 717, 140 A.3d 301.
We begin by observing that the trial court properly considered the defendant's age in determining whether, in light of the totality of the circumstances, the defendant was in custody during the interrogation. The court noted that, at the time of the interview, the defendant was sixteen years old, and also observed that it was **327 due to his age that Fador did not want *685 to interview the defendant in the absence of his parents. In fact, in the trial court, it was undisputed that the defendant was five weeks short of his seventeenth birthday at the time of the interrogation. Under the facts of the present case, we conclude that the trial court gave sufficient consideration and weight to the defendant's age. The United States Supreme Court has held that, although courts must consider a juvenile's age as one factor in the custody analysis, a child's age will not necessarily be "a determinative, or even a significant, factor in every case." J.D.B. v. North Carolina , supra, 564 U.S. at 277, 131 S.Ct. 2394.
There is no question that the Appellate Court also considered the age of the defendant in assessing all of his claims, including the custody analysis. The first factual finding of the trial court that the Appellate Court noted as relevant to its review was: "On March 23, 2012, the defendant was a student at Torrington High School, and was less than one month from his seventeenth birthday." State v. Castillo , supra, 165 Conn. App. at 706, 140 A.3d 301. The Appellate Court decision made multiple references to the defendant's age. For example, the court observed that, "[b]ecause of the defendant's age, Fador would not conduct an interview without a parent present." Id., at 707-708, 140 A.3d 301. The court also noted that, "on May 10, 2012, the defendant was arrested pursuant to a juvenile arrest warrant...." Id., at 710, 140 A.3d 301. The Appellate Court scrupulously examined the record and concluded that "no reasonable person in the defendant's position would have believed that he was 'in custody' for purposes of Miranda ." (Emphasis added.) Id., at 716, 140 A.3d 301. The Appellate Court decision also referenced the defendant's age in its analysis of the voluntariness of his statements by noting that "[t]he defendant was nearly seventeen years old at the time he was questioned, and there was no indication that he was poorly educated or developmentally challenged." Id., at 724, 140 A.3d 301. We conclude, **328 therefore, that the Appellate Court complied with the holding of J.D.B. that courts must consider a juvenile's age as one factor in the custody analysis, and that it is proper in that analysis to consider whether a juvenile is close to the age of majority.[7] See *686 J.D.B. v. North Carolina , supra, 564 U.S. at 277, 131 S.Ct. 2394.
The Appellate Court aptly summarized the circumstances that we considered compelling in our custody analysis in Mangual . "First, the police had initiated the contact, and were not invited into the apartment by the defendant, but 'entered under the authority of a search warrant, an inherently coercive and intimidating police action.' " Id. We also note that, in Mangual , the police encounter was "wholly unexpected" by the defendant. State v. Mangual , supra, 311 Conn. at 199, 85 A.3d 627. The Appellate Court additionally observed that, in Mangual , this court "considered the action particularly intimidating given **329 that seven armed officers in tactical vests participated in the execution of the warrant.... Second, the officers brandished their weapons when they announced themselves and entered the small, four room apartment, actions that the court deemed an occupant reasonably could have associated with the police effecting an arrest.... The court found significant that the officers prohibited the defendant from leaving or otherwise moving about the apartment. In such circumstances, it was reasonable for the defendant to perceive such an imposing display of authority as a clear indication that the police intended to assume and maintain full control over her and her daughters.... The court considered the relatively large number of officers, many, if not all of whom were present in the living room when the defendant was questioned, to be a third factor supporting a finding of custody, citing several federal Circuit Courts of Appeals for the proposition that the presence of a large number of visibly armed law enforcement officers goes a long way [toward] making the suspect's home a police-dominated atmosphere.... Fourth, the police exercised complete control over the defendant and her surroundings before, during and after her questioning.... As soon as the officers entered the apartment, they ordered the defendant to go to the living room, where she was confined to the couch and placed under guard. The court noted that [t]his exercise of total control over the defendant stands in stark contrast to the far more relaxed environment that is a hallmark of interrogations in a suspect's home that have been found to be noncustodial.... Finally, the court indicated that the police never explained to the defendant the nature, purpose, or likely duration of her detention." (Citations omitted; internal quotation marks omitted.) State v. Castillo , supra, 165 Conn. App. at 717-18, 140 A.3d 301.
We agree with the Appellate Court that the circumstances of the present case stand in stark contrast to **330 those presented in Mangual . The encounter, which lasted a total of forty-five minutes, did not have the hallmarks of coercion that we relied on in Mangual . Unlike the defendant in Mangual , whose encounter with the police in her home was "wholly unexpected"; State v. Mangual , supra, 311 Conn. at 199, 85 A.3d 627 ; the defendant in the present case had been alerted in advance that the police would be coming to the home to question him. That is, on April 10, 2012, Fador informed the defendant that he would be returning to the home to question him about this incident, when his mother was present.
As the Appellate Court further explained, "[a]lthough the police initiated contact with the defendant and his family, the police did not enter the house on their own authority, such as pursuant to a search warrant, but were invited in by *687 Monegro.[8] The police informed Monegro of the purpose for their visit before she allowed them to enter.[9] There were only three officers present, **331 one of whom was acting as a translator.[10] The detectives wore plain clothes, not tactical gear. Although the defendant was asked to come into the living room to speak with the police, he was never threatened with arrest or searched, he was never handcuffed, and the police took no other action, either verbal or physical, to intimidate the defendant or to restrict his movement or to confine him to that particular room. The detectives and Rios each carried sidearms, but they were never brandished at any point, nor did any of the officers threaten the use of force on the defendant or his family. Both Fador and Rios informed Monegro that she could end the interview at any time, and the defendant was told more than once that his presence was voluntary, and that he was free to leave and did not have to answer their questions. He was told this orally before any questions were ever asked, and the same instructions were provided to him in writing as part of the waiver form, which he signed prior to giving his oral statement and written confession. Such instructions were not provided to the defendant in Mangual . [ State v. Mangual , supra, 311 Conn. at 204-205, 85 A.3d 627 ]; see State v. Edwards , 299 Conn. 419, 437, 11 A.3d 116 (2011)... ('a fact finder reasonably might find that a reasonable person would feel free to leave when that person was told repeatedly that he could do so' ...). There is no evidence in the record that the defendant was overly nervous or intimidated during the encounter." (Footnotes added.) State v. Castillo , supra, 165 Conn. App. at 719, 140 A.3d 301.
We also note our agreement with the Appellate Court that, "[i]n terms of whether a reasonable person would feel that his freedom of movement was restrained to the degree associated with a formal arrest and, therefore, that he was 'in custody,' the circumstances surrounding **332 the defendant's interview in the present case appear no more coercive or intimidating an atmosphere than was present in other cases in which our Supreme Court determined that *688 a suspect questioned in a residence prior to an arrest was not 'in custody' and, thus, not entitled to Miranda [warnings]. See, e.g., State v. Kirby , 280 Conn. 361, 369-70, 392-94, 396, 908 A.2d 506 (2006) (defendant [was] not 'in custody' for Miranda purposes although five police officers arrived at his home at 4:30 a.m. to question him about kidnapping and assault because defendant invited officers into home, defendant knew why police were there, encounter lasted less than fifteen minutes, officers' guns stayed holstered, and defendant [was] not handcuffed until after he admitted to kidnapping); State v. Johnson , 241 Conn. 702, 714-21, 699 A.2d 57 (1997) (defendant [was] not 'in custody' although confronted by two detectives and uniformed police officer in driveway of father's house prior to consenting to be questioned in kitchen)." State v. Castillo , supra, 165 Conn. App. at 720, 140 A.3d 301. In summary, the Appellate Court properly concluded that "the defendant was not 'in custody' at the time he provided his statements to the police and, therefore, was not entitled to Miranda warnings." Id., at 722, 140 A.3d 301.
We are not persuaded by the defendant's arguments that two factors that this court typically has relied on to conclude that a suspect was not in custody support the opposite inference in the present case. First, the defendant suggests that the particular circumstances of the interview transformed his home into a coercive atmosphere. Second, he contends that the presence of his mother during the interview made him feel less free to leave. The defendant therefore contends that both of these factors support the conclusion that he was in custody. We address each of these arguments in turn.
First, the defendant contends that, under the circumstances of the present case, the fact that the questioning **333 took place in his home supports the conclusion that he was in custody. The defendant suggests that the officers should have given him the option of being questioned at the police station if he had preferred. He does not argue that an interview at the station would have been less coercive. Without providing any authority for the proposition, he appears to suggest that, if the police had offered him the choice of a more coercive atmosphere, that may have rendered the interview in the present case less coercive. We reject the defendant's suggestion.
The defendant claims that the particular circumstances of the encounter transformed the living room into a " 'police-dominated atmosphere.' " He places great emphasis on the presence of three officers in the room. We first observe, however, the stark contrast between the number of police officers in the present case as compared to Mangual , in which there were seven officers, some of whom wore tactical gear, and some of whom entered the room brandishing weapons. State v. Mangual , supra, 311 Conn. at 186, 199-200, 85 A.3d 627. In the present case, there were fewer than one half of the officers who were involved in Mangual , and none of them wore tactical gear or brandished weapons. It is also significant that the third officer, Rios, was present specifically for the purpose of translating for Monegro. Another fact that the defendant relies on is that the officers were "within 'arm's length' " of him during the questioning. As we have observed, however, the officers did not in any way restrict the movement of the defendant or others in the apartment. These circumstances differ sharply from those presented in Mangual , in which the officers "exercised complete control over the defendant and her surroundings...." State v. Mangual , supra, at 201, 85 A.3d 627. Also, as we already have observed, the *689 defendant repeatedly was told that he was free **334 to ask the officers to leave and was free to end the questioning at any time.
Second, the defendant argues that the presence of his mother made the atmosphere more coercive and, therefore, weighs in favor of concluding that he was in custody. He relies on testimony at the suppression hearing that Monegro appeared "angry," "worried," "nervous," and "upset" over the course of the interview and testimony at trial that, at one point during the interview, she "yelled" at the defendant in Spanish. Although we can envision facts under which the presence of a parent would render a police encounter more coercive; see generally H. Farber, " The Role of the Parent/Guardian in Juvenile Custodial Interrogations: Friend or Foe?," 41 Am. Crim. L. Rev. 1277 (2004) ; the presence of a parent is generally considered to provide greater protection to a juvenile. See, e.g., General Statutes § 46b-137 (c) (conditioning admissibility, in delinquency proceeding, of statement by juvenile on, inter alia, presence of parent). The mere fact that Monegro became upset when she heard the details of the crime of which the defendant was accused, without more, is not sufficient to demonstrate that her presence made the police encounter more coercive.
II
We next address the defendant's claim that the Appellate Court improperly declined to adopt a "per se rule requiring that whenever police investigating a felony give Miranda warnings to a juvenile, those warnings must include notice that any statement by the juvenile may be used against the juvenile in adult criminal court if the case is transferred there from juvenile court." State v. Castillo , supra, 165 Conn. App. at 729, 140 A.3d 301. As we stated at the outset of this opinion, we understand the defendant to be requesting this court to exercise its supervisory authority to adopt the suggested per se **335 rule.[11] The defendant contends that the court should exercise its supervisory authority because, even if we agree with the Appellate Court that the defendant was not in custody and, therefore, that his " Miranda rights were never implicated in the present case"; id., at 730, 140 A.3d 301 ; an "unknown number" of other juvenile suspects over the years may have been misled about the potential " 'adult' " consequences of giving a statement to the police, and others similarly could be misled in the future.
The defendant's request that this court exercise its supervisory authority focuses on the juvenile waiver form that he signed. The defendant notes that, although the document is expressly titled "JUVENILE WAIVER," the form merely informs the defendant that his statements may be used against him "in a court of law." The form does not expressly state that his waiver would apply not only in juvenile proceedings, but also in adult criminal proceedings. The defendant therefore contends that the phrase "in a court of law" was insufficient to alert him that his statements could be used against him in adult criminal proceedings.[12] We agree *690 with the Appellate Court that, under the facts of the present case, **336 it would be inappropriate to exercise our supervisory authority to adopt the per se rule requested by the defendant.
"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice.... Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole.... Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Citation omitted; internal quotation marks omitted.) State v. Elson , 311 Conn. 726, 764-65, 91 A.3d 862 (2014).
We are mindful, however, that our "[s]upervisory authority is an extraordinary remedy that should be used sparingly ... [and that] authority ... is not a form of free-floating justice, untethered to legal principle.... Our supervisory powers are not a last bastion of hope for every untenable appeal.... Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts.... Overall, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers.... Thus, we are more likely to invoke our supervisory powers when there is a pervasive and significant problem ... or when the conduct or violation at issue is offensive to the sound administration of justice...." (Citations omitted; internal quotation marks omitted.) State v. Edwards , 314 Conn. 465, 498-99, 102 A.3d 52 (2014).
**337 In the present case, because the defendant was not in custody at the time of the interrogation, the police were not constitutionally required to provide him with Miranda warnings. See State v. Mangual , supra, 311 Conn. at 192, 85 A.3d 627. In support of his claim that this court should adopt a per se rule that goes beyond the facts of the present case and beyond what was constitutionally required, the defendant does not offer any evidence that there is a pervasive and significant problem that would justify the invocation of our supervisory authority. Instead, the defendant merely offers broad assertions and speculation. That is, the defendant claims it is possible that "an unknown number of juvenile suspects ... may have been misled or deceived about the potential 'adult' consequences of giving a statement to the police." He additionally points to the decisions of the United States Supreme Court and this court recognizing limits on the maximum punishments that can be imposed on juveniles on the basis that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." Graham v. Florida , 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) ; see also State v. Riley , 315 Conn. 637, 644, 110 A.3d 1205 (2015) (noting "the unique aspects *691 of adolescence"), cert. denied, --- U.S. ----, 136 S.Ct. 1361, 194 L.Ed.2d 376 (2016). Finally, he offers the sweeping observation that the question of whether the police should be required to issue such warnings presents "an important question of public policy...."
Although we agree with the defendant that the hypothetical question he poses implicates an important question of public policy, we decline to invoke our supervisory authority to issue the requested rule where the facts of the defendant's case did not give rise to the issue and where he has not demonstrated that the claimed problem is a pervasive one. Indeed, we observe **338 that at the top of the form that the defendant signed, the heading "City of Torrington" appears immediately above what appears to be the city's seal or insignia. On its face, then, the form appears to be unique to the city of Torrington. The defendant's speculation that some juvenile suspects could be misled amounts to an invitation to this court to exercise its supervisory authority to issue an advisory opinion to address facts that were not presented in the defendant's case. That we will not do.
The judgment of the Appellate Court is affirmed.
In this opinion PALMER, McDONALD, ROBINSON and MULLINS, Js., concurred.
D'AURIA, J., dissenting.
To navigate our system of justice, citizens are required to not only understand their rights but, also, the consequences of exercising or waiving those rights. This is difficult enough for many citizens. That difficulty can be exacerbated when there are obstacles interfering with citizens' understanding of their rights. The protections mandated by Miranda v. Arizona , 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are intended to guard against "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." These safeguards must be "effective to secure the privilege against self-incrimination." Id. , at 444, 86 S.Ct. 1602.
In this case, the defendant, William Castillo, claims, among other things, that his status as a juvenile, along with the inaccurate or incomplete information provided by the police to him and his mother, who spoke "[v]ery little" English, led him to believe that the statement he gave to officers could be used against him only in a juvenile proceeding, and the police should have informed him his statement could be used against him if **339 his case were transferred to the regular criminal docket. State v. Castillo , 165 Conn. App. 703, 705-706, 140 A.3d 301 (2016). The Appellate Court declined to reach the issue of whether the warning given to the defendant and his mother was adequate on the ground that he was not in custody for purposes of Miranda when questioned and, therefore, not entitled to warnings in the first place. Id., at 722, 140 A.3d 301. On appeal to this court, the majority follows suit and, consistent with how this court granted the petition for certification, addresses only the custody question and agrees with the Appellate Court.
Although I admit it is a close question, I would conclude that the defendant was in custody for several reasons, the chief reason among them being that the defendant was a juvenile at the time. Although that factor is not dispositive, it must be considered under J.D.B. v. North Carolina , 564 U.S. 261, 277, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). I reach the conclusion that the defendant was in custody due to the totality of the circumstances, including because *692 he was a juvenile and because the officers in this case actually issued him warnings before taking his statement-warnings the defendant claims are deficient-and, therefore, I disagree with the majority's conclusion to the contrary.
I also believe that, irrespective of whether he was in custody while interrogated, the defendant's state constitutional claim can be adjudicated, namely, that the police provide juvenile suspects with a warning, regardless of whether they are in custody, that their statements can also be used against them in a case tried on the regular criminal docket. When, pursuant to state law, police officers have actually informed the defendant of his rights and obtained a waiver, and the defendant's claim on appeal includes that those warnings misinformed him about the scope of his rights under our state constitution, I believe a court can entertain that claim. I would therefore reverse and remand this case **340 to the Appellate Court to decide the defendant's constitutional challenges to the warnings he received.
I
A
Whether a suspect is "in custody" for purposes of Miranda requires examination of "all of the circumstances surrounding [any] interrogation" to determine "how a reasonable person in the suspect's position would perceive his or her freedom to leave...." (Emphasis added; internal quotation marks omitted.) J.D.B. v. North Carolina , supra, 564 U.S. at 270-71, 131 S.Ct. 2394. This "ultimate inquiry ... calls for application of the controlling legal standard to the historical facts [and] ... therefore, presents a ... question of law ... over which our review is de novo." (Internal quotation marks omitted.) State v. Mangual , 311 Conn. 182, 197, 85 A.3d 627 (2014). To assist in this inquiry, this court has developed a "nonexclusive list" of ten factors for courts to consider (Mangual factors). Id., at 196-97, 85 A.3d 627.
Appellate review of a claim that a statement was obtained in violation of Miranda requires "a scrupulous examination of the record ... in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding [as to custody] is supported by substantial evidence." (Internal quotation marks omitted.) Id., at 197, 85 A.3d 627. This examination is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, we may also consider undisputed facts established in the record, including the evidence presented at trial. See State v. Edmonds , 323 Conn. 34, 39, 145 A.3d 861 (2016) ("in reviewing the record, we are bound to consider not only the trial court's factual findings, but also the full testimony of the arresting officers; in particular, we must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state **341 but that the trial court did not expressly discredit"); State v. Edwards , 299 Conn. 419, 439 n.16, 11 A.3d 116 (2011) ("to determine whether the defendant's constitutional rights have been infringed, [w]e review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress" [internal quotation marks omitted] ).
Admittedly, as my introductory paragraphs indicate, my own scrupulous examination of the record leads me to emphasize certain facts or factors not emphasized by the state, the trial court, the Appellate Court or the majority. That courts and litigants will seek to highlight or explain away certain factors, or compare and contrast the relevant factors in one case to *693 those considered in another case, is a predictable result of court developed multifactor tests, including the Mangual factors for measuring custody. Although tests of this nature can often be useful, determining whether a suspect is in custody is a " 'slippery' " task; State v. Mangual , supra, 311 Conn. at 193, 85 A.3d 627 ; and "not always self-evident." State v. Januszewski , 182 Conn. 142, 158, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981). "No definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody." State v. DesLaurier , 230 Conn. 572, 577, 646 A.2d 108 (1994). Indeed, a heavy focus on enumerated factors, or comparisons to other precedents, may eclipse the "ultimate inquiry" before the court, which is case specific: "whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) State v. Mangual , supra, at 194, 85 A.3d 627. **342 B
In my view, any analysis of the question of custody in the present case must begin with the fact that the defendant was a juvenile at the time. We have not had occasion to consider the question of the custody of a juvenile by the police since the United States Supreme Court's relatively recent decision in J.D.B. , a case neither the trial court nor the Appellate Court cited. In fact, age or juvenile status is not among the ten, nonexclusive Mangual factors. After J.D.B. , it must be. Compare J.D.B. v. North Carolina , supra, 564 U.S. at 277, 131 S.Ct. 2394 ("[age] is ... a reality that courts cannot simply ignore") with id., at 288, 131 S.Ct. 2394 (Alito, J., dissenting) ("there is no denying that, by incorporating age into its analysis, the [c]ourt is embarking on a new expansion of the established custody standard").
In particular, the United States Supreme Court in J.D.B. rejected the state of North Carolina's argument that age "has no place" in an analysis of whether a "reasonable person in the suspect's position would understand his freedom to terminate questioning and leave...." Id., at 271, 131 S.Ct. 2394 (majority opinion). J.D.B. made clear that "courts cannot simply ignore" a juvenile suspect's age. Id., at 277, 131 S.Ct. 2394. Instead, the court recognized that a juvenile "subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." Id., at 272, 131 S.Ct. 2394. The court went on to note that age is "more than a chronological fact," as juveniles "generally are less mature and responsible than adults .. often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them [and] are more vulnerable or susceptible to ... outside pressures than adults...." (Citations omitted; internal quotation marks omitted.) Id. ; see also State v. Riley , 315 Conn. 637, 658, 110 A.3d 1205 (2015) (noting attributes of juveniles, including "immaturity, impetuosity, and failure to **343 appreciate risks and consequences" [internal quotation marks omitted] ), cert. denied, --- U.S. ----, 136 S.Ct. 1361, 194 L.Ed.2d 376 (2016). Any statements given during an encounter that a juvenile would reasonably regard as custodial are less likely to be the product of the person's free choice. See J.D.B. v. North Carolina , supra, at 272-73, 131 S.Ct. 2394 ("[n]o matter how sophisticated, a juvenile subject of police interrogation cannot be compared to an adult subject" [internal quotation marks omitted] ). If a reasonable juvenile in the suspect's position would feel a restraint on his freedom *694 to the degree of a formal arrest, then the suspect must knowingly and voluntarily waive his rights to remain silent and to have counsel present before any statement he makes may be used against him in court. Id., at 268-70, 131 S.Ct. 2394 ; see Miranda v. Arizona , supra, 384 U.S. at 444-45, 86 S.Ct. 1602.
These observations, which underpin J.D.B. 's rationale, are consistent with, and drawn from, decisions from this court and the United States Supreme Court, including recent cases involving the sentencing of juvenile defendants. See, e.g., Miller v. Alabama , 567 U.S. 460, 471, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (noting that juveniles are "more vulnerable" to outside influences and have "limited contro[l] over their own environment" [internal quotation marks omitted] ); Graham v. Florida , 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) ("developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"); State v. Riley , supra, 315 Conn. at 650, 658, 110 A.3d 1205 (noting differences in maturity of juveniles versus adults).
C
Therefore, my principal disagreement with the decision of the trial court and the opinion of the Appellate Court is that I find little evidence that those courts examined the defendant's circumstances from the position **344 of a sixteen year old boy. Perhaps because age is not listed among the Mangual factors, the trial court did not manifest its consideration of the defendant's age beyond noting that the defendant was nearing his seventeenth birthday. The court did not explain how this fact might be probative of a suspect, under these particular circumstances, feeling that he was not dominated by the police. Certainly, a sixteen year old juvenile might be less susceptible to coercion than a younger juvenile, but that comparison says little about how a sixteen year old would feel as compared to an adult in the same situation. In my view, a sixteen year old being questioned in his mother's living room likely would feel less free to leave or command the officers to leave than an adult questioned in his own house. See J.D.B. v. North Carolina , supra, 564 U.S. at 272-73, 131 S.Ct. 2394 ; see also Roper v. Simmons , 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("[e]ven the normal [sixteen year old] customarily lacks the maturity of an adult" [internal quotation marks omitted] ); State v. Riley , supra, 315 Conn. at 660-61, 110 A.3d 1205 (reversing sentence when trial court did not adequately consider defendant's age and its hallmark features when determining sentence of defendant who was seventeen years old at time of crime). The Appellate Court gave the defendant's age no meaningfully greater attention than the trial court gave, and neither does today's majority.
For example, in concluding that the defendant was not in custody, the Appellate Court, like the majority, compares the facts of the present case to those in Mangual . The defendant in Mangual was not a juvenile, however. Nor, in my view, was the question of custody in Mangual a close case. Mangual involved questioning the suspect in a home after seven police officers had entered pursuant to a search warrant and with weapons drawn. State v. Mangual , supra, 311 Conn. at 187 n.3, 85 A.3d 627. I do not read Mangual to establish a minimum for what **345 actions may be considered custodial interrogation in the home, especially for a juvenile suspect. The fact that there were more officers present in Mangual , for a longer period of time and with weapons brandished does little-but only little-to help answer the question of custody in the present case. *695 Although there were only three officers present in this case versus seven in Mangual , is a juvenile likely to know that three officers are not that many or to feel free to ask them all to leave? And although the officers did not threaten or physically restrain the defendant in the present case, does that mean a juvenile would not feel restricted by their presence and their intent to question him after confronting him with evidence against him? And even though the interview in the present case ultimately lasted only forty five minutes, the juvenile defendant was not told how long it would last when he began giving his incriminating statements, nor was he told whether he would be formally arrested afterward. In short, even though the circumstances in Mangual add up to a clearer case for concluding that the adult defendant was in custody-or that things could have been worse for this young man-that conclusion does not mean that, under the circumstances of this case, a juvenile in the defendant's position would not feel that he was in a "police-dominated atmosphere." (Internal quotation marks omitted.) Id., at 206-207, 85 A.3d 627. In this regard, I find precedents that did not involve juvenile defendants-and especially those decided before J.D.B. -are not particularly instructive. See, e.g., State v. Kirby , 280 Conn. 361, 908 A.2d 506 (2006) ; State v. Johnson , 241 Conn. 702, 699 A.2d 57 (1997).
In addition to minimizing the significance of the defendant's age, the trial court and the Appellate Court emphasized factors that, in my view, are not properly considered as part of a custody analysis, while ignoring factors that often contribute to establishing a custodial **346 setting. For example, the trial court expressly relied on the fact that "[t]he defendant had prior dealings with police, specifically, an encounter with [the uniformed officer]." But testimony at the suppression hearing established only that the uniformed officer remembered the defendant ; the uniformed officer acknowledged in his testimony at the suppression hearing that he did not know whether the defendant had recognized him . In fact, the testimony revealed few details about this prior encounter, surely not enough to know whether it was cordial or hostile, or even how a juvenile in the defendant's position might have perceived the encounter. All we know is that previously the uniformed officer, while assisting a school resource officer during a fight at the defendant's school, had escorted the defendant off a school bus, though it is not clear whether the defendant was involved in the fight or whether the officer touched or restrained the defendant when escorting him away.
The relevance of the trial court's references to this incident is not clear to me. There was certainly no evidence presented to suggest that this prior encounter would have put someone in the defendant's position at ease in the uniformed officer's presence or in the presence of other law enforcement officers not known to the defendant. And a hostile prior encounter would likely have left a person in the defendant's position intimidated by the uniformed officer's later appearance in his mother's home. For this reason, prior contact with law enforcement is generally too speculative of a factor to consider in a custody analysis, and, therefore, any reliance by the trial court on the vague circumstances of this prior incident was misplaced. See Yarborough v. Alvarado , 541 U.S. 652, 668, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (explaining it would be "improper" to consider "prior history with law enforcement" because "the relationship between a suspect's **347 past experiences and the likelihood a reasonable person with that experience would feel free to leave *696 often will be speculative").[1]
The Appellate Court, in explaining why the defendant was not in custody, observed "[t]here is no evidence in the record that the defendant was overly nervous or intimidated during the encounter." State v. Castillo , supra, 165 Conn. App. at 719, 140 A.3d 301. But because the question of custody is an objective inquiry, whether this defendant was nervous or intimidated is irrelevant when determining how a reasonable juvenile, in the defendant's position, would perceive his freedom of movement. See J.D.B. v. North Carolina , supra, 564 U.S. at 271, 131 S.Ct. 2394 ("[t]he test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning").[2] Although the defendant's behavior might bear on whether he voluntarily relinquished his rights under Miranda , it should not be part of a custody analysis. Additionally, the Appellate **348 Court observed that the encounter was not coercive because "the police did not enter the house on their own authority ... but were invited in by [the defendant's mother]." State v. Castillo , supra, at 719, 140 A.3d 301. The evidence indicates, however, that the defendant was not present in the living room (where the entry door was located) when the police entered the apartment, so a juvenile in his position would have been unaware of how the police had entered the home or under what authority. And more significantly, the encounter was initiated by the police, not the defendant, which is another factor indicating custody. State v. Mangual , supra, 311 Conn. at 199, 85 A.3d 627 ("[w]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist" [internal quotation marks omitted] ).
Although the trial court and the Appellate Court relied on factors that were irrelevant and unsupported by the record, they did not expressly consider certain factors I consider more relevant, including the fact that, as soon as the defendant had finished signing the forms and before being questioned, he was confronted by one of the detectives with the fact that they already had evidence of his involvement from his companions in the car that night. Immediately after obtaining a waiver, the detective seated near the defendant told him *697 that they had already spoken to the others involved, were aware of his role, and that it was "probably in his best interest not to lie about it...." An officer stating that he believes that the suspect committed a crime and has evidence to prove it may lead a person in the suspect's position and hearing those allegations to conclude that the officer will not permit him to leave. See, e.g., State v. Ross , 230 Conn. 183, 204-205, 646 A.2d 1318 (1994) (although not dispositive, "[a]n officer's [articulated] ... beliefs concerning the potential culpability of the **349 individual being questioned, may be one among many factors that bear upon the assessment [of] whether that individual was in custody" [internal quotation marks omitted] ), cert. denied, 513 U.S. 1165, 115 S.Ct. 1133, 130 L.Ed.2d 1095 (1995), quoting Stansbury v. California , 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ; State v. McKenna , 166 N.H. 671, 683, 103 A.3d 756 (2014) ("accusatory statements made by the officers and directed at the defendant also weigh in favor of custody" [emphasis omitted] ), cert. denied, --- U.S. ----, 135 S.Ct. 1504, 191 L.Ed.2d 431 (2015).
I am also persuaded that the fact that both the defendant and his mother were advised of his rights, verbally and in writing, and asked by the uniformed officer and the detectives who had come to his home to execute waivers, would contribute to a juvenile in the defendant's position feeling a restraint upon his freedom of movement. "Although giving a Miranda warning does not, in and of itself, convert an otherwise [noncustodial] interview into a custodial interrogation, it is a factor to be considered by the court." United States v. Bautista , 145 F.3d 1140, 1148 (10th Cir.), cert. denied, 525 U.S. 911, 119 S.Ct. 255, 142 L.Ed.2d 210 (1998) ; see also Slwooko v. State , 139 P.3d 593, 600 (Alaska App. 2006) ("[c]ourts generally agree that the giving of Miranda warnings does not convert a [noncustodial] interview into a custodial one ... although it is a factor that a court may consider when assessing custody"). One commentator has observed, however, that "an overwhelming majority of suspects feel that they are in custody once the [Miranda ] warnings are read." A. Maoz, " Empty Promises: Miranda Warnings in Noncustodial Interrogations," 110 Mich. L. Rev. 1309, 1328 (2012). It hardly takes an extrajudicial understanding to conclude, once the defendant and his mother had read and been read his legal rights-a familiar incantation that often accompanies arrest-and been asked by **350 three officers to sign forms with police letterhead and containing terms such as "lawyer," "police officer" and "court of law," that a sixteen year old would reasonably feel a restraint upon his freedom of movement. See id., 1324 ("[g]iven the strength of the association between the Miranda warnings and formal arrest, a person likely would not feel the increased level of freedom associated with noncustodial interrogation-for example, being able to get up and leave the interrogation or make a phone call to a lawyer-after the warnings have been administered"). Although the trial court noted that the detective told the defendant he could ask them to leave, one detective testified that, apparently, he did not mention this to the defendant until after the defendant had begun narrating his statement.
D
Judging the totality of the circumstances, I find the question of custody to be a much closer call than the majority, the Appellate Court, or the trial court. The defendant was a sixteen year old juvenile who was at home in his mother's apartment when his mother or her boyfriend summoned him to the living room to speak to police officers. There were three police *698 officers waiting for him-two plain clothed detectives with badges displayed, and one officer in uniform. The detectives and the uniformed officer carried firearms. The defendant had seen the two detectives a few days earlier when they originally had come by the home to question him but then left when they learned his mother was not at home. They were back, and this time with a third member of the Torrington Police Department, the uniformed officer, to translate for the defendant's Spanish-speaking mother.
The police officers spoke to the defendant in the living room. The defendant and one of the detectives were seated, and the other detective was standing in **351 the living room, closer to the front door of the apartment. The detective seated near the defendant told him about his right to refuse questioning, with the uniformed officer translating the conversation for the defendant's mother. The detective presented the defendant with a form, entitled "Juvenile Waiver," and explained the form to him. The defendant did not ask any questions, indicated that he understood, and initialed and signed the form. Although the form explained that the defendant could refuse to answer questions, it did not explain whether he was, at that time, under arrest. None of the police officers present told him, at that time, that he was not under arrest, that he was free to leave the room or the home, or that he could ask the officers to leave. Nor did they tell the defendant how long the interview would likely last or what would happen to him at its conclusion. The uniformed officer presented the defendant's mother with a parental consent form, which the officer translated into Spanish for her. She initialed and signed it, allowing the officers to interrogate the defendant.
Once the waivers were signed, the detective seated with the defendant then told him that they were there to discuss his involvement in a robbery, that others involved had given statements to police, and it was "probably in his best interest not to lie about it because [they] had ... evidence that he was there." The defendant then asked, "[w]hat do you want me to do?" The detective replied that he wanted "a statement of his involvement" because the police had other statements "saying what [his] involvement [was] but it's better to come from [the defendant]." The defendant then gave a statement implicating himself in the robbery, with the detective writing down the defendant's statement for him as he narrated it. While the detective was writing the statement, he informed the defendant that he was free to ask the officers to leave.
**352 At the point when he began giving the statement, would a sixteen year old juvenile-surrounded by three armed police officers who initiated contact with him, and having been read his Miranda rights and confronted with the evidence against him-know that he was not under arrest? Would this juvenile feel free to go-to get up and leave the room after being summoned there at the request of the police officers? Or would he feel free to ask the officers to leave the apartment after his mother let them in to question him? Or would he believe that the police officers were detaining him, given his involvement in a crime? Because I am persuaded that a reasonable sixteen year old in this situation would feel that he was in police custody, I respectfully dissent from the majority's conclusion to the contrary.
E
The majority makes a somewhat different case-and candidly, in my view, a better case-for custody than the Appellate *699 Court or the trial court, as the majority neither relies on any previous encounter between the defendant and an officer nor relies on the defendant's demeanor or his mother's invitation to the officers to enter her home. Rather, the majority relies principally on the facts that the defendant was questioned at home with his mother present. Although it is not inappropriate for an appellate court undertaking plenary review to reassess and reweigh the totality of the circumstances, such an alternative analysis by a reviewing court does not leave me any more confident that the principal factfinder appropriately sought to view the encounter from the position of a reasonable sixteen year old, as J.D.B. demands. See J.D.B. v. North Carolina , supra, 564 U.S. at 281, 131 S.Ct. 2394 (not resolving whether juvenile was "in custody when police interrogated him" but remanding case to state court for resolution of that question "this time taking account of all of the relevant circumstances **353 of the interrogation, including J.D.B. 's age at the time"). Moreover, the facts of the present case cast doubt on the ability of the defendant's mother to play the role that the majority envisions-and that state law contemplates-in maintaining a noncustodial atmosphere. Specifically, she was not properly informed about the defendant's rights and the consequences of his providing a statement to officers, and, therefore, in my view, her presence was not sufficient to overcome the police dominated atmosphere the defendant experienced.
To be sure, interrogations inside a suspect's home are significantly less likely to present the pressures of a custodial interrogation. See In re Kevin K. , 299 Conn. 107, 128, 7 A.3d 898 (2010). But in the present case, even though the defendant was questioned while sitting in the familiar surroundings of the family living room, he was more or less surrounded by three police officers whom he had not invited into the home. He instead had been summoned to the living room to be questioned by them after they were allowed into the home by his mother. He was then questioned after they told him they had evidence he was involved in a crime and after having been given Miranda warnings-likely an intimidating experience for anyone, let alone a sixteen year old. And even though the officers eventually told him that he could leave or ask them to leave, they did not tell him so until after he had begun his statement. I doubt a juvenile in those circumstances would feel free to depart or ask the officers to leave his mother's home after she had allowed them inside.
Besides relying on the fact that the home was the setting for this interrogation, the majority also reasons that the "presence of a parent is generally considered to provide greater protection to a juvenile" who is being interrogated. In support of this proposition, the majority cites General Statutes § 46b-137, which governs the **354 admissibility, in juvenile proceedings, of confessions made outside the presence of a juvenile's parent or guardian. I agree with the majority that § 46b-137"recognizes the unique role that parents play in protecting their children's rights." Footnote 9 of the majority opinion. The parent's company may help a juvenile feel less dominated by a police presence. In large part, this is because § 46b-137, including its mandatory advisement of rights, is "designed to ensure that the child and the parent or guardian have made a valid decision to make a voluntary admission." In re Kevin K. , 109 Conn. App. 206, 220, 951 A.2d 39 (2008), rev'd on other grounds, 299 Conn. 107, 7 A.3d 898 (2010).
In my view, however, any general presumption that the presence of a juvenile suspect's parent has protected him is less *700 relevant in the present case. First, the presence of a parent often can do as much harm in this regard as good, requiring a closer look at the objective circumstances of the parent's involvement. As the majority acknowledges, sometimes a parent's presence enhances the coerciveness of the situation. See, e.g., H. B. Farber, " The Role of the Parent/Guardian in Juvenile Custodial Interrogations: Friend or Foe?," 41 Am. Crim. L. Rev. 1277, 1289 (2004). Moreover, when the parent is misinformed or not fully informed of the child's rights, or the consequences of waiving those rights, reliance on the parent's presence to protect the child and keep him from feeling dominated by the police can be misplaced. See id., 1291.
In the present case, the defendant's mother spoke "[v]ery little" English and, therefore, the forms that the police gave her and the defendant to explain the defendant's rights were translated for her line by line. The forms did not mention whether the defendant was in custody at the time or whether the defendant or his mother was free to ask the officers to leave. In addition, as the state conceded during oral argument before this **355 court, the form provided to the mother contained errors that gave flawed advice about whether and how any statements the defendant gave could be used against him. See footnote 12 of the majority opinion. The form initially explained that anything the juvenile said "can and will be used against him/her during any questioning ," suggesting that anything the defendant said would not be used against him outside of the interrogation. (Emphasis added.) Later in the form it explained that "any statement given can be used for or against him/ her in a court of law," suggesting that an incriminating statement might actually be used to help the defendant in a court proceeding. (Emphasis added.) The mother's ability to assist the defendant would have been influenced by the information she received from the police, through an interpreter, about the scope of the defendant's rights and the consequences of him giving a statement. As one of the detectives later testified, the parent's and the child's forms "go hand in hand. You give the parental consent [form] prior to doing the juvenile waiver, so it's-it's the parents allowing us to interview the child."
More fundamentally, the defendant has challenged the constitutional adequacy of the warnings provided to him, including those contained in the form captioned "Juvenile Waiver," which was presented to him and read to his mother by the detectives through the uniformed officer as the translator. Specifically, he argued to the Appellate Court, on federal and state constitutional grounds, that the warnings he received "were deficient because they failed to inform [him] that any statement or confession could be used against him in an adult criminal prosecution." If the defendant is right about his claim, specifically, that he and his mother should have been informed that any of his statements could be used not just in a juvenile delinquency proceeding but also in an prosecution on the regular criminal **356 docket-an issue the Appellate Court did not reach and I do not pass upon-then does not the failure to provide this clarity undercut the parent's ability to provide, as described by the majority, "greater protection" to the child and serve the "unique role" that our law, including § 46b-137, contemplates? And does it not also undercut the heavy reliance the state places upon the parent's presence as a factor to maintaining a noncustodial setting?
In light of the defendant's challenge to the adequacy of these forms, and the impact that their alleged inadequacies might have had on the mother's understanding of the defendant's rights or the consequences *701 of him waiving those rights, I have serious reservations about relying on his mother's presence to establish that the defendant would feel free to ask the officers to leave the home, especially when his mother ultimately permitted them to interrogate the defendant after receiving potentially flawed advice.
F
I emphasize that, in reaching my conclusion that the defendant was in custody, I do not mean to suggest that the police officers in the present case did anything untoward. Their conduct in this encounter might well be described as exemplary. Although their forms were flawed, which was likely not of their own doing, they followed state law and the conventions of their department, seeking to interview the defendant only after contacting his mother and permitting her presence. See General Statutes § 46b-137 (b). There is no evidence that they were impolite or used improper force. The presence of the two detectives resulted from department protocol that they work in pairs and, in this situation, they required the uniformed officer as an interpreter for the defendant's mother. Their appearance at the house, presumably in their usual work attire **357 and with their usual weaponry, was in no way inappropriate. It is not inconsistent to conclude, however, that the encounter might nevertheless seem custodial from the perspective of a sixteen year old.
A conclusion that the defendant was in custody under these particular circumstances merely requires that the officers-in compliance with state law-ensure that a juvenile suspect understands his rights and the officers seek a waiver of those rights before obtaining a statement from him. That is exactly what the officers set out to do. The defendant's challenge to the warnings contained in the forms may well go nowhere, but if a court were to rule that a juvenile is entitled to a warning that his statements can be used should he be prosecuted on the regular criminal docket, and not just in juvenile court, I have no doubt that the officers would comply.
On the state of this record and the law, the trial court had "no hesitation" in concluding under the circumstances that the defendant's waiver was "knowing, voluntary, and intelligent." I would not rely on the issue of custody to avoid review of the important question of whether the warnings were sufficient and whether the defendant's waiver was therefore valid. Accordingly, I would reverse and remand the case to the Appellate Court to consider this claim.
II
In part I of this opinion, I conclude that, because the defendant was in custody for purposes of Miranda , we should remand this case to the Appellate Court to address his claim that the warnings given to him were inadequate under the federal and state constitutions. In this part of the opinion, I suggest that, even if the defendant was not in custody, this should not prevent consideration of at least his state constitutional claim that the police should be required to warn juveniles that their statements can be used against them if they **358 are tried on the regular criminal docket instead of in juvenile court. Rather, largely because of state statute and caselaw, I believe the state constitutional claim the defendant advanced in the Appellate Court arises regardless of his custodial status and should be addressed.
Ordinarily, the need to determine whether the defendant was in custody arises when the defendant was not informed of his rights pursuant to Miranda because analyzing whether the defendant was in custody dictates whether he was *702 entitled to those warnings in the first place. See Stansbury v. California , supra, 511 U.S. at 322, 114 S.Ct. 1526 (Miranda warnings required only when suspect is in police custody when interrogated). In the present case, however, the police did provide the defendant with warnings before questioning him, irrespective of whether they believed he was in custody or not. The need for these warnings came about because the defendant was sixteen years old when interviewed. Section 46b-137[3] generally provides that admissions, confessions, **359 or statements by children under the age of sixteen to a police officer or juvenile court official are inadmissible in a delinquency proceeding unless the child's parent, parents or guardian are present and all have been advised (1) of the child's right to counsel, including appointed counsel, (2) the child's right to refuse to make any statements, and (3) "that any statements the child makes may be introduced *703 into evidence against the child." (Emphasis added.) General Statutes § 46b-137 (a). A similar protocol applies to sixteen and seventeen year old juveniles, except that the juvenile's parents or guardians do not need to be present during any interview but, rather, the police officer or Juvenile **360 Court official who is questioning the juvenile must make "reasonable efforts to contact a parent or guardian of the child" and advise the child that he "has the right to contact a parent or guardian and to have a parent or guardian present during any interview...." General Statutes § 46b-137 (b).
The advisement of the child's rights is "not simply a pro forma requirement of the statute but an integral component also designed to ensure that the child and the parent or guardian have made a valid decision to make a voluntary admission." In re Kevin K. , supra, 109 Conn. App. at 220, 951 A.2d 39. Thus, decades before the United States Supreme Court modified a good deal of its constitutional jurisprudence related to juveniles in our criminal justice system, our legislature had acted upon its own "concerns for the special vulnerabilities of juveniles...."[4] In re Kevin K. , supra, 299 Conn. at 115, 7 A.3d 898.
In the half century since the statute's enactment, the United States Supreme Court has recognized that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." Graham v. Florida , supra, 560 U.S. at 68, 130 S.Ct. 2011 ; see also Miller v. Alabama , supra, 567 U.S. at 471, 132 S.Ct. 2455. In particular, and as discussed earlier, on the question of whether a juvenile is in custody for Miranda purposes, the United States Supreme Court in J.D.B. v. North Carolina , supra, 564 U.S. at 272, 131 S.Ct. 2394, noted that juveniles are generally "less mature and responsible than adults ... often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them ... [and] are more vulnerable or susceptible **361 to ... outside pressures than adults...." (Citations omitted; internal quotation marks omitted.) "[When] subjected to police questioning [juveniles] will sometimes feel pressured to submit when a reasonable adult would feel free to go." Id. Thus, as applied to juveniles, the legislative policy codified in § 46b-137 advances the same laudable goal as Miranda warnings generally: to guard against "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda v. Arizona , supra, 384 U.S. at 467, 86 S.Ct. 1602. For that reason, Miranda directed the "use of procedural safeguards effective to secure the privilege against self-incrimination." (Internal quotation marks omitted.) State v. Edwards , supra, 299 Conn. at 426, 11 A.3d 116.
A main difference, however, between Miranda and § 46b-137 (b) is that, unlike Miranda , the statute's mandatory advisement of rights applies irrespective of whether the suspect was "in custody." In re Kevin K. , supra, 109 Conn. App. at 217-18, 951 A.2d 39. It might even be said that under § 46b-137 custody is presumed, or at least irrelevant, when officers are interviewing juveniles and securing statements intended to be used against them.
*704 But what our state law gives, it just as quickly takes away. Paradoxically, it is this progressive state policy-ahead of its time-that in part gives rise to the defendant's state constitutional claim and, at the same time, creates obstacles to its resolution in the present case and, indeed, in many other cases.
Although § 46b-137 (a) and (b) require that officers-regardless of whether the suspect is in custody-advise the juvenile that "any statement the child makes may be introduced into evidence against the child," the statute does not specify in which forum that statement may be introduced as evidence against him.
**362 As a practical matter, even though the statute deals with the admission of confessions in juvenile proceedings, at the time the warnings are administered to a juvenile, three things are not known: (1) what charges the juvenile will face, if any; (2) which forum he will defend himself in, juvenile court or on the regular criminal docket; and (3) whether a court will ultimately conclude he was in custody or not when interrogated. Irrespective of these contingencies, however, the juvenile receives the warnings if officers are following the state statute.
If, however, the juvenile's statement results in a qualifying charge-essentially a serious felony charge-as in the present case, "[t]he court shall automatically transfer" the case to the "regular criminal docket...." General Statutes § 46b-127 (a). When the defendant claims that under § 46b-137 he should have been advised that his statement would be admissible in a case on the regular criminal docket-not just juvenile court as § 46b-137 exclusively governs[5] and the "Juvenile Waiver" form the defendant signed arguably connotes-he will be met with the argument, accepted by the Appellate Court in this case; State v. Castillo , supra, 165 Conn. App. at 728, 140 A.3d 301 ; that the statute does not apply to charges on the regular criminal docket. See State v. Ledbetter , 263 Conn. 1, 11, 818 A.2d 1 (2003) ("the provisions of § 46b-137 [a] do not apply in a case ... in which the state seeks to use the confession in a proceeding in criminal, rather than juvenile, court"). When the defendant argues alternatively under the state constitution that he had a right to be advised that his statement would be admissible in a case on the regular criminal docket, as the defendant in the present case argued before the Appellate Court, he may be met with the argument that he was not in custody, perhaps largely **363 because of his parent's presence, and, so, he was not entitled to any warnings, even the warnings under § 46b-137 (a) the officers were compelled to give and that the defendant challenges as insufficient.
Included among the claims the defendant made in the Appellate Court was that, under article first, § 8, of the state constitution,[6] a juvenile must be informed of the possibility of adult prosecution before he can make a voluntary, knowing, and intelligent waiver of his privilege against self-incrimination. This was separate and apart from his claims that his Miranda waiver was invalid and his confession involuntary under due process principles.[7] As the Appellate Court described *705 the defendant's state constitutional claim, the defendant asserted that the officers interrogating him had "failed to advise him that any statements that he made could be used against him not only in any juvenile proceeding but in an adult criminal prosecution...." State v. Castillo , supra, 165 Conn. App. at 705, 140 A.3d 301.[8] **364 Thus, this is not a case in which the defendant argues only that he is entitled to a warning he did not receive-state law directs officers to provide the warnings whether the juvenile suspect is in custody or not should the juvenile's statement be used against him in juvenile court. Rather, the defendant claims that the warning he did receive-which was compelled by state law-was incomplete or misleading under the state constitution. 2 W. LaFave et. al., Criminal Procedure (4th Ed. 2015) § 6.9 (c), p. 925 ("there is an absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of any of the applicable rights"). If the defendant is correct that under our state constitution this warning must specifically include an advisement that the statements he makes may be admitted in a case on the regular criminal docket, and not just in juvenile court, it is not clear to me why only juveniles who received a nonspecific warning while in custody would be entitled to that further caution. Statements provided after the giving of this warning may result in charges transferred to the regular criminal docket whether he was in custody or not.
In opposing the defendant's request that we exercise supervisory authority to reach his state constitutional claim, the Appellate Court framed the issue in justiciability terms: "Because we have determined in the present case that Miranda warnings were not required because the defendant was not subjected to a custodial interrogation, any further discussion about the content of such warnings would be untethered to any actual controversy and, thus, premature." State v. Castillo , supra, 165 Conn. App. at 730, 140 A.3d 301. In the Appellate Court's view, the defendant lacked standing because this claim can, apparently, be brought only by those under the age of eighteen who are interrogated under custodial circumstances. As I argue in part I of this opinion, I **365 believe this case qualifies because the defendant was in custody for Miranda purposes.
However, even if I am wrong about that, I do not believe we are required to exercise our supervisory authority to reach this issue in the present case. See *706 State v. Lockhart , 298 Conn. 537, 576, 4 A.3d 1176 (2010). Even a defendant who was not in custody when interviewed, but who received a warning that he claims was misleading or incomplete about statements he makes that may be introduced against him, in my view, has a justiciable claim.
I do not know how this challenge would come out. It may well fail because the defendant's argument does not compel a conclusion that our state constitution requires such a warning. Or we may conclude, as we did in State v. Perez , 218 Conn. 714, 722-28, 591 A.2d 119 (1991), that a due process analysis under the federal constitution[9] that takes into account the lack of such a specific warning among the "totality of the circumstances" suffices to protect the juvenile's rights. But if the Appellate Court agreed with the defendant that the warnings given were inadequate under article first, § 8, of our state constitution, in my view, that court could award him relief.
**366 For these reasons, even if I were to conclude that defendant was not in custody, I would reverse the judgment and remand the case to the Appellate Court to consider that state constitutional question. Accordingly, I respectfully dissent.

Section 53a-135 (a) was amended by No. 12-186, § 1, of the 2012 Public Acts, which made technical changes to the statute that are not relevant to this appeal. In the interest of simplicity, we refer to the current revision of the statute.

We granted the defendant's petition for certification to appeal from the judgment of the Appellate Court, limited to the following three issues: (1) "Did the Appellate Court correctly determine that the defendant was not in custody for Miranda v. Arizona , [supra, 384 U.S. at 478-79, 86 S.Ct. 1602] purposes during his in-home interrogation by the police?" (2) "Did the Appellate Court correctly determine that the trial court's factual finding, that the defendant was at home when the police arrived to interrogate him, was not clearly erroneous?" (3) "Did the Appellate Court correctly determine that it was inappropriate or premature for that court to consider the defendant's supervisory claim?" State v. Castillo , 323 Conn. 903, 150 A.3d 684 (2016).
We need not address the second certified question. At oral argument before this court, the defendant effectively abandoned that claim-that the trial court's finding that the defendant was at home when the police arrived to interrogate him was clearly erroneous. During oral argument before this court, the defendant asserted that an articulation that the trial court had issued subsequent to the grant of certification to appeal had "rendered moot" his challenge to the trial court's factual finding that he was at home when the officers arrived.
Specifically, at the Appellate Court, in support of his claim that the trial court's factual finding was clearly erroneous, the defendant relied on what he characterized as conflicting testimony on the issue of his initial location. Although his mother testified that he was at home, two officers suggested in their testimony that he was not immediately available and had to be contacted and summoned by his family. See State v. Castillo , supra, 165 Conn. App. at 720-21, 140 A.3d 301. Following this court's grant of certification to appeal from the judgment of the Appellate Court, the defendant filed a motion for rectification with the trial court, requesting that court to allow additional testimony on the issue of the defendant's location when the police first arrived at his home. The trial court denied the motion for rectification because it concluded that the defendant had not demonstrated that rectification of the record was appropriate.
In response to the motion for rectification, however, the court issued an articulation of the basis for its factual finding that the defendant was in the apartment when the police arrived. The court reviewed the testimony offered at the suppression hearing and clarified that, although the testimony of the two officers suggested that the defendant was not initially present in the living room , neither officer was clear regarding the defendant's precise whereabouts. The defendant's mother, by contrast, testified clearly and unequivocally that the defendant was at home at the time that the officers arrived. Put another way, the officers only testified clearly and unequivocally regarding where the defendant was not located-in the living room. That testimony, the trial court explained, did not conflict with the mother's testimony regarding where the defendant was located-in the apartment. The trial court explained: "In view of the fact that the officers were not unequivocal and specific about the defendant's whereabouts when they arrived at the apartment, the court elected to credit the one witness who was unequivocal and specific about this issue: the defendant's mother."

Fador testified at the suppression hearing that, when the defendant told him that his mother spoke no English, Fador informed the defendant that he would bring a Spanish speaking officer with him when he returned.

The defendant emphasizes that the officers expressly informed him that he could ask them to leave the apartment only after he and his mother already had signed the waiver forms. Therefore, the defendant argues, the officers' statement that he was free to ask them to leave does not support a finding that he was not in custody. We are not persuaded. Even if we were to conclude that the officers were required to inform the defendant that he was free to ask them to leave before he signed the waiver forms, the defendant's argument fails for two reasons. First, the juvenile waiver form expressly informed the defendant that he had the right to stop answering questions at any time. Second, Fador testified that when the defendant arrived, the officers explained to the defendant and his mother that, if he chose not to sign the waiver forms, "the interview would be stopped."

The defendant also claimed that his statements to the police were not voluntary and that they were inadmissible at trial pursuant to General Statutes (Rev. to 2011) § 46b-137 (c). See State v. Castillo , supra, 165 Conn. App. at 705, 140 A.3d 301. The Appellate Court concluded that the defendant's reliance on § 46b-137 (c) lacked merit because, "[d]espite the defendant's arguments to the contrary, § 46b-137 has no bearing on the admissibility of statements offered in adult criminal proceedings. Accordingly, it could not have provided an independent basis for granting the defendant's motion to suppress." Id., at 728, 140 A.3d 301. Because the defendant did not seek certification as to those two issues, they are not before us in this appeal.

We observe that the dissent refers to the defendant's home as "his mother's home." That phrase suggests that the defendant was merely a visitor in his mother's home. It is undisputed, however, that the apartment was not only his mother's home, but also his home.

This case stands in sharp contrast to the facts presented in J.D.B. v. North Carolina , supra, 564 U.S. at 261, 131 S.Ct. 2394. In that case, the defendant was thirteen years old at the time of his interrogation. Id., at 265, 131 S.Ct. 2394. He was removed from his seventh grade social studies class by a uniformed police officer who had been assigned to work at the middle school that the defendant attended. Id. The defendant was then brought into a closed conference room in the school, where he was questioned by two police officers in the presence of two school administrators, in the absence of any parent or guardian. Id., at 265-66, 131 S.Ct. 2394. The court recognized that the parties' submissions injected a degree of ambiguity into the issue of whether the defendant had been informed prior to his confession that he was free to leave and not obligated to speak to the officers; the court also noted that the state supreme court had indicated that the trial court's factual findings indicated that the defendant had not been so informed. Id., at 267 n.2, 131 S.Ct. 2394. Even under those extreme facts, the court merely remanded the case to the state courts for a determination of whether the defendant was in custody, after applying the proper legal analysis. Id.
In the present case, the defendant was almost seventeen years old and was questioned in the presence of his mother, in his home. He was informed that he was free to ask the officers to leave and was informed that he was not obligated to speak to the officers at all. In J.D.B. , the court noted that it is proper to consider that a juvenile is close to the age of majority. Id., at 277, 131 S.Ct. 2394. Under the circumstances of the present case, we conclude that the trial court's and the Appellate Court's custody analyses complied with the holding of J.D.B.

We reject the defendant's suggestion that, because the record does not reflect that the officers expressly informed Monegro that she could refuse to let them in to the apartment, she did not "actually" invite them inside.

Although we agree with the Appellate Court that the manner in which the police enter the home is always relevant in determining whether, under the totality of the circumstances, an individual would have felt free to terminate the interrogation; see State v. Castillo , supra, 165 Conn. App. at 719, 140 A.3d 301 ; we observe that this fact has only limited significance in the present case, as the defendant did not himself invite the police into the home. In particular, his status as a juvenile and the fact that it was his mother who invited the police into the home are relevant to our assignment of minor significance to Monegro's consent to the entry. On the one hand, our law recognizes the unique role that parents play in protecting their children's rights. See, e.g., General Statutes § 46b-137 (c) (conditioning admissibility, in delinquency proceeding, of statement by juvenile on, inter alia, presence of parent). In light of the role that parents play in safeguarding their children's rights, police entry with a parent's consent at least generally renders an encounter less coercive than police entry that is authorized by a warrant. On the other hand, a child's parent is most frequently the person who is the head of the household and is in a position to exercise authority over the child. When the head of the household has consented to the officers' entry, it is reasonable to assign only minimal significance to that fact when determining whether a juvenile would feel free, subsequently, to ask the officers to leave.

As we already have observed, on April 10, 2012, Fador had notified the defendant that when he returned, he would be bringing an officer with him to serve as a translator. See footnote 3 of this opinion.

A narrow and literal interpretation of the certified issue as limited to the question of whether the Appellate Court properly declined to exercise any authority it may have to issue the requested prophylactic rule would yield the bizarre result that if this court agreed with the defendant, it would remand the case to the Appellate Court with direction to exercise such supervisory authority. That narrow reading would constitute an improper abdication of this court's duty and authority over the administration of justice.

At oral argument, the state conceded that there were two errors in the parental consent form that Monegro signed. Specifically, the form (1) represented that the defendant's statements could be used against him "during any questioning," rather than "in a court of law," and (2) improperly included the attestation that "I also know that any statement given can be used for or against him ... in a court of law." In response to this court's statement that the form needed to be revised to correct the errors, the state's attorney represented that she already had notified the proper persons.

In its brief to this court, the state suggests that the defendant's "prior experience with the police," and, particularly, his experience with the uniformed officer in question, "would have lessened the impact of the encounter on him." Even if it were a relevant consideration post-Yarborough , given how little is known about the defendant's "prior experience with [law enforcement]" on this record, I cannot draw such an inference. Although Yarborough observed that suspects with such experience "may understand police procedures and reasonably feel free to leave unless told otherwise," it also explained that, "[o]n the other hand, they may view [the] past as [a] prologue and expect another in a string of arrests." Yarborough v. Alvarado , supra, 541 U.S. at 668, 124 S.Ct. 2140. Thus, because this factor "turns too much on the suspect's subjective state of mind and not enough on the objective circumstances of the interrogation," after Yarborough a suspect's prior experience with law enforcement is not a proper factor for determining whether a suspect is in custody. (Internal quotation marks omitted.) Id., at 669, 124 S.Ct. 2140.

For example, the trial court noted the defendant's " 'mellow' " and "calm" demeanor, based at least in part on the testimony from the uniformed officer and the detectives that he was "mellow," "disengaged," "calm" and had a "like whatever" attitude. These observations about a sixteen year old boy might just as easily be manifestations of false bravado, "immaturity, impetuosity, and failure to appreciate risks and consequences," including which court he will end up in. State v. Riley , supra, 315 Conn. at 658, 110 A.3d 1205.

General Statutes § 46b-137 provides in pertinent part: "(a) Any admission, confession or statement, written or oral, made by a child under the age of sixteen to a police officer or Juvenile Court official shall be inadmissible in any proceeding concerning the alleged delinquency of the child making such admission, confession or statement unless made by such child in the presence of the child's parent or parents or guardian and after the parent or parents or guardian and child have been advised (1) of the child's right to retain counsel, or if unable to afford counsel, to have counsel appointed on the child's behalf, (2) of the child's right to refuse to make any statements, and (3) that any statements the child makes may be introduced into evidence against the child.
"(b) Any admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer or Juvenile Court official, except an admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer in connection with a case transferred to the Juvenile Court from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters, shall be inadmissible in any proceeding concerning the alleged delinquency of the child making such admission, confession or statement, unless (1) the police or Juvenile Court official has made reasonable efforts to contact a parent or guardian of the child, and (2) such child has been advised that (A) the child has the right to contact a parent or guardian and to have a parent or guardian present during any interview, (B) the child has the right to retain counsel or, if unable to afford counsel, to have counsel appointed on behalf of the child, (C) the child has the right to refuse to make any statement, and (D) any statement the child makes may be introduced into evidence against the child.
"(c) The admissibility of any admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer or Juvenile Court official, except an admission, confession or statement, written or oral, made by a child sixteen or seventeen years of age to a police officer in connection with a case transferred to the Juvenile Court from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters, shall be determined by considering the totality of the circumstances at the time of the making of such admission, confession or statement. When determining the admissibility of such admission, confession or statement, the court shall consider (1) the age, experience, education, background and intelligence of the child, (2) the capacity of the child to understand the advice concerning rights and warnings required under subdivision (2) of subsection (b) of this section, the nature of the privilege against self-incrimination under the United States and Connecticut Constitutions, and the consequences of waiving such rights and privilege, (3) the opportunity the child had to speak with a parent, guardian or some other suitable individual prior to or while making such admission, confession or statement, and (4) the circumstances surrounding the making of the admission, confession or statement, including, but not limited to, (A) when and where the admission, confession or statement was made, (B) the reasonableness of proceeding, or the need to proceed, without a parent or guardian present, and (C) the reasonableness of efforts by the police or Juvenile Court official to attempt to contact a parent or guardian...."

The legislative history of § 46b-137 and its predecessor, General Statutes (Rev. to 1968) § 17-66d, indicates that it was passed in response to the United States Supreme Court's decision in In re Gault , 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), which held that juveniles, like adults, have certain constitutional rights, including the privilege against self-incrimination. See State v. Ledbetter , 263 Conn. 1, 17 n.24, 818 A.2d 1 (2003).

The Appellate Court determined that, read as a whole, "§ 46b-137 has no bearing on the admissibility of statements offered in adult proceedings." State v. Castillo , supra, 165 Conn. App. at 728, 140 A.3d 301.

Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law...."

The defendant, quoting State v. Jackson , 304 Conn. 383, 419 n.27, 40 A.3d 290 (2012), noted accurately that "[w]hether the defendant was in custody ... and whether the defendant's statements were voluntary are, although related, analytically separate inquiries." There is, however, "considerable overlap" between the two. Id., at 421, 40 A.3d 290.

The analysis the defendant advanced in the Appellate Court in support of his state constitutional claim reflects many of the same points about juveniles' vulnerabilities recognized by the United States Supreme Court in J.D.B. In particular, the defendant cited authority to establish that juveniles lack maturity to meaningfully waive Miranda rights; K. King, "Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children From Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights," 2006 No. 2 Wis. L. Rev. 431, 431-33 (2006); that juveniles waive their rights at higher rates than adults; B. Feld, "Behind Closed Doors: What Really Happens When Cops Question Kids," 23 Cornell J.L. & Pub. Pol'y 395, 429 (2013) ; that recent neuroscience suggests that juveniles do not reason in the same manner as adults and demonstrate immature decision-making skills; K. King, supra, pp. 434-35 ; and that even sixteen and seventeen year old juveniles do not fully appreciate the concepts involved with the Miranda warnings or the consequences of waiving those rights. See B. Feld, supra, pp. 409-410.

In State v. Perez , supra, 218 Conn. at 714, 591 A.2d 119, this court declined to adopt the "rigid rule" the defendant proposed that a "confession is rendered involuntary solely by virtue of the fact that the police did not inform the juvenile that he could be prosecuted as an adult, rather than as a juvenile." Id., at 727, 591 A.2d 119. This court made clear, however, that because the defendant had failed to provide a cogent state constitutional analysis, it answered this question only as a matter of federal constitutional law. Id., at 723, 591 A.2d 119. In Ledbetter v. Commissioner of Correction , 275 Conn. 451, 459, 880 A.2d 160 (2005), cert. denied sub nom. Ledbetter v. Lantz , 546 U.S. 1187, 126 S.Ct. 1368, 164 L.Ed.2d 77 (2006), we noted that in Perez we "left undecided the issue of whether article first, § 8, requires the police to advise juvenile suspects that they may be prosecuted as adults." Ledbetter held that the failure of an attorney to raise the issue left open in Perez did not constitute ineffective assistance of counsel. Id., at 462, 880 A.2d 160.